

# NUMBER 13-12-00359-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MIRTA ZORRILLA,                                           **Appellant,**

**v.**

AYPCO CONSTRUCTION II, LLC
AND JOSE LUIS MUNOZ,                             **Appellees.**

## On appeal from the 370th District Court
## of Hidalgo County, Texas.

# OPINION

## Before Justices Rodriguez, Garza, and Perkes
## Opinion by Justice Rodriguez

This is an appeal from a jury's verdict in favor of appellees AYPCO Construction II, LLC and Jorge Luis Munoz (collectively, AYPCO) on their breach of contract and fraud claims against appellant Mirta Zorrilla. By seven issues, Zorrilla challenges: the

sufficiency of the evidence supporting the jury's breach of contract and fraud findings; the trial court's refusal to submit a prior material breach jury instruction requested by Zorrilla; the prejudgment interest awarded in the judgment; the foreclosure of two mechanic's liens in favor of AYPCO; the awarding of both attorney's fees and exemplary damages, which Zorrilla contends is a double recovery in light of AYPCO's fraud election; and the amount of exemplary damages. We affirm as modified.

## I. Background

Zorrilla contracted with AYPCO to complete construction of her home at 15555 N. 23rd Street in Edinburg, Texas.[1] The contract contained a clause that required any changes to the original plans to be in writing and agreed to by both parties.

AYPCO began work in December 2006. AYPCO billed Zorrilla through weekly invoice-type documents it titled "weekly advances," which would list the expenses incurred by AYPCO during that week. Zorrilla paid the invoices through the end of April 2007. Substantial additional work that was not explicitly included in the original contract was done on the N. 23rd Street home (the construction of a large guest house and structure connecting the guest house to the main house) and on another home owned by Zorrilla at 3518 Plaza del Lago (repairs to the sprinkler system and painting and other work to remediate water damage). The parties dispute the extent to which Zorrilla approved this additional work and whether it was authorized under the contract. Zorrilla contends that she never authorized the construction of a guest house at the N. 23rd Street property, which was the bulk of the additional work not covered by the contract; that

---

[1] Another contractor had begun but not finished the construction project.

2

she repeatedly requested that AYPCO cease work when she realized that the additional work was being performed; and that the "weekly advances" given to her by AYPCO were confusing, vague, and did not give her the written notice required under the contract. AYPCO contends that Zorrilla requested all of the additional work that was performed; that AYPCO detailed all of the additional work in the "weekly advances"; and that Zorrilla was repeatedly late in making payments on the weekly invoices and then completely ceased making payments in May 2007.

After Zorrilla refused to make further payments, AYPCO sued Zorrilla for breach of contract and fraud.[2] The breach of contract and fraud actions were based on Zorrilla's alleged failure to pay the costs for the work done in May 2007 at N. 23rd Street and Plaza del Lago. AYPCO also sought foreclosure of mechanics' liens it had attached to those properties. The case was tried to a jury.

At the charge conference, Zorrilla asked for a jury question on prior material breach by AYPCO for its failure to execute written change orders before performing the additional work. The trial court denied Zorrilla's request. The jury then found that Zorrilla breached her contract with AYPCO and awarded $54,264.15 in damages for the N. 23rd Street project and $2,390 in damages for the Plaza del Lago project. The jury awarded $150,000 in attorney's fees based on the contract action. The jury also found that Zorrilla committed fraud and awarded the same damages for fraud as it awarded for

---

[2] AYPCO also sued Zorrilla for quantum meruit, violation of the Texas Construction Fund Act, negligent misrepresentation, defamation, and violation of the Prompt Payment Act. The defamation, Construction Funds Act, and Prompt Payment Act claims were dismissed on directed verdict. The jury rendered no verdict on the quantum meruit claim because the jury question on that claim was predicated on a "no" answer to the breach of contract jury question. The negligent misrepresentation claim was not submitted to the jury.

3

the contract verdict, a total of $56,654.15. In connection with the fraud verdict, the jury additionally awarded $250,000 in exemplary damages.

In its motion for entry of judgment, AYPCO elected to recover under its fraud claim.[3] In its judgment, the trial court awarded $56,654.15 in actual damages, $45,877.48 in pre-judgment interest, $250,000 in exemplary damages, and $150,000 in attorney's fees. The trial court also ordered that both properties be foreclosed and sold to satisfy the judgment. Zorrilla filed a motion for new trial, arguing that the trial court erred in failing to require AYPCO to elect remedies, that the evidence was insufficient to support the verdict, that the exemplary damages should be reduced in accordance with the statutory cap, that the liens were invalid, and that the trial court used an incorrect pre-judgment interest calculation. The motion was overruled by operation of law, *see* TEX. R. CIV. P. 329b(c), and this appeal followed.

## II. Evidence of Fraud

Because AYPCO elected to recover on the jury's fraud verdict, we first address Zorrilla's fifth issue, in which she argues that the evidence was legally and factually insufficient to support the jury's finding that she committed fraud. *See* TEX. R. APP. P. 47.1. Specifically, Zorrilla argues that the evidence was insufficient to prove she never intended to perform her part of the contract as promised.

### A. Standard of Review

We will sustain a legal-sufficiency or no-evidence challenge if the record shows: (1) the complete absence of evidence of a vital fact; (2) the court is barred by the

---

[3] Counsel for AYPCO orally confirmed its fraud election at the hearing on its motion for entry of judgment.

rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When reviewing a no-evidence challenge, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* at 807. The ultimate test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827. In reviewing a no-evidence issue, the court indulges every reasonable inference in support of that finding. *Id.* at 822.

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *Id.* at 819. "Most credibility questions are implicit rather than explicit in a jury's verdict." *Id.* Therefore, reviewing courts must assume that the jurors decided all credibility questions in favor of the verdict if reasonable persons could do so. *Id.* "Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id.*

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, as is the case here, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*

5

*v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469–70 (Tex. App.—Corpus Christi 2008, pet. denied). In our factual-sufficiency review, we consider and weigh all the evidence, but like in our legal-sufficiency review, we defer to the jury as the sole judge of the witnesses' credibility. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *see Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *Golden Eagle Archery*, 116 S.W.3d at 761.

**B.    Applicable Law**

In the context of a civil jury trial, the sufficiency of the evidence is reviewed in light of the charge submitted if no objection is made to the charge. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). Here, Zorrilla made no objections to the fraud question, so we will review the evidence in light of the law included in the charge submitted to the jury in this case. The fraud question in this case provided as follows:

> Did MIRTA ZORRILLA commit fraud against AYPCO CONSTRUCTION II, LLC?
>
> Fraud occurs when:
>
> a.    a party makes a material misrepresentation, and
>
> b.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
>
> c.    the misrepresentation is made with the intention that it should be acted on by the other party, and

6

d.      the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means:

A false statement of fact, or

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

Zorrilla's fifth issue focuses on whether there was sufficient evidence of the requisite fraudulent intent—i.e., under the law in the charge here, whether there was evidence that, at the time Zorrilla made her promise under the contract, she did not intend to perform.

> "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." [*Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)]. "Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). While breach of the contract alone is not evidence that a party did not intend to perform, "breach combined with 'slight circumstantial evidence' of fraud" is some evidence of fraudulent intent, enough to support a verdict. *Id.* "[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric*, 708 S.W.2d at 434 (citing *Chicago, T. & M.C. Ry. Co. v. Titterington*, 84 Tex. 218, 19 S.W. 472, 474 (1892)).

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex. 2009) (per curiam). Although circumstantial evidence may be used to establish any material fact, it must transcend mere suspicion; there must be a logical bridge between the proffered evidence and the fact. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citation omitted). Regardless, intent is a

7

fact question uniquely within the realm of the trier of fact because it depends so heavily on the credibility of witnesses and the weight given to their testimony. *Spoljaric*, 708 S.W.2d at 434.

## C.    The Evidence

At trial, AYPCO's owner, Munoz, testified that he and Zorrilla signed a contract in early December 2006 for Munoz to complete the construction of Zorrilla's new home on N. 23rd Street. The written contract, signed by both parties, was admitted into evidence. The estimate for the work detailed in the contract was $212,973. The contract provided that any variations in the "prices, measurements and configuration of this estimate" may result in extra charges at Zorrilla's expense.

Munoz testified that, during the entire project, he would speak to Zorrilla two to four times a day and that she was at the construction site nearly every day before and after she went to work. Munoz testified that Zorrilla requested numerous modifications to the main house construction throughout the project. Munoz explained to Zorrilla that each of the modifications would cost more and increase the construction time.

Munoz then testified that Zorrilla requested that he construct a guest house on the N. 23rd Street property. Munoz designed the guest house per Zorrilla's specifications and gave her an estimate of $149,460 for its construction. Zorrilla also requested that AYPCO construct a roof-like structure connecting the guest house to the main house. When they were discussing this additional structure, Zorrilla told Munoz that she did not have enough money to pay for the finished project. Munoz testified that Zorrilla nonetheless ordered him to complete construction of the guest house and connecting

8

structure. Munoz testified that Zorrilla was onsite on the day construction began on the guest house. An invoice was admitted into evidence that expressly detailed work on the guest house; Munoz testified that Zorrilla had been given a copy of that invoice and had written a check for payment of that invoice. Munoz testified that the revised total estimate, which included the original contract work, the guest house, and the other requested modifications, was approximately $540,000.

Munoz testified that, from the beginning, Zorrilla was repeatedly late in making her payments. He testified that when he would question Zorrilla about the late payments, she would become angry. In May 2007, Zorrilla stopped making payments. Munoz testified that he was not asked to stop work on the project until June 4, 2007, at which point Zorrilla and her attorney asked Munoz to hand over his key, to not return to the construction site, and to send any future communications to Zorrilla through her attorney. Munoz testified that when he stopped work, approximately seventy percent of the guest house project had been completed.

Mario Arevalo, one of Munoz's subcontractors, testified that he has done cabinet, framing, and other workworking since 1985 and has worked with AYPCO since 2002. Arevalo testified that Zorrilla was at the N. 23rd Street construction site regularly. Throughout the project, Zorrilla asked Arevalo to make numerous changes to the original specifications; when she asked Arevalo for a modification, she told him to pass that information along to Munoz.

There was also testimony from an electrician who worked on the N. 23rd Street house before AYPCO took over the project. Gaston Palma testified that he contracted

directly with Zorrilla for the work. Palma testified that he completed the electrical work, but because of a dispute between Zorrilla and the then-carpenter on the project, the walls were never built over the wiring. Zorrilla had requested the carpenter to move a wall, which was a deviation from the original plan. The carpenter informed Zorrilla that it would cost more to move the wall, but Zorrilla did not want to pay the additional cost. Zorrilla and the carpenter never came to an agreement and, in the time they were disputing the issue, the exposed wires were stolen from the construction site. Zorrilla then refused to pay Palma. Palma testified that he later learned that Zorrilla had collected an insurance settlement for the stolen wires. After learning that, he "didn't want to deal with" Zorrilla any longer. He filed a lien on the N. 23rd Street house for the amount Zorrilla failed to pay him.

Finally, Zorrilla testified as to her version of the events surrounding the construction project. She testified that she hired Munoz at her accountant's recommendation to finish the construction of the house at N. 23rd Street. With regard to the first contractor who worked on the house, Zorrilla testified that he was a friend and that she did not end up paying him because he did not charge her. However, counsel for AYPCO then attempted to impeach Zorrilla by admitting her deposition testimony, in which she stated that she did not pay the original contractor because he did not supervise the project to her satisfaction. In her deposition, Zorrilla also referred to the original contractor as a friend, stated that he was supervising the construction of the N. 23rd Street house as a favor, and stated that they ended their business relationship on friendly terms when it became apparent that the contractor did not have time to supervise

10

Zorrilla's project.

Zorrilla testified that she was at the construction site as much as possible, but was very busy at work during this time period. She testified that she did not go to the site to supervise, but merely to check on the progress of the house. She continued to pay the charges invoiced by Munoz but did not pay attention to the details because she was so busy. In the end, Zorrilla had paid AYPCO approximately $366,000.

Zorrilla denied that she requested any modifications to the main house project. She confirmed that she paid several invoices that referenced "modifications" to the project. But, in general, she was unsatisfied with the amount of detail in the invoices Munoz gave her. She testified that she repeatedly asked Munoz for a more specific breakdown of the project costs, but the most he ever brought her was a binder of invoices and other paperwork, which, Zorrilla testified, contained only Munoz's name and not Zorrilla's address, account number, or any other information to identify Zorrilla's project.

Zorrilla also denied that she asked Munoz to build a guest house. She confirmed that she saw the 2,300 square foot guest house being built, but "trusted" Munoz and continued paying because her accountant advised her to do so. She testified that Munoz built the guest house "against her wishes."

Finally, Zorrilla denied that she requested that AYPCO perform any work at her Plaza del Lago house. She denied that any of Munoz's subcontractors had done work at the Plaza del Lago house.

Zorilla testified that she told Munoz to stop work on the project at the end of April 2007 and that she did not understand why he continued to work through May. She

11

testified that she did not observe any substantive work being done on her property during May 2007—no painting, no tape-and-float work, no electrical work. She testified that she hired a lawyer to force Munoz to stop work and leave the work site.

**D. Analysis**

Zorrilla argues that there is no evidence showing she never intended to perform her obligations under the contract and that the evidence showed no acts inconsistent with an intent to perform. *See Aquaplex, Inc.*, 297 S.W.3d at 774 (citing *Formosa Plastics Corp.*, 960 S.W.2d at 48). We disagree. Although there is no direct evidence of fraudulent intent, such evidence is rarely available. *See Tony Gullo Motors I, L.P.*, 212 S.W.3d at 305. And the circumstantial evidence before the jury here, combined with Zorrilla's failure to fully pay for the work performed, was sufficient to prove the requisite intent. *See Spoljaric*, 708 S.W.2d at 435.

The most compelling circumstantial evidence of Zorrilla's fraudulent intent was her denial that she requested the construction of a guest house coupled with her failure to pay the full cost of the contract. The subsequent denial of a promise to perform coupled with nonperformance is sufficient to prove fraudulent intent at the time of making the promise to perform. *See Finch v. McVea*, 543 S.W.2d 449, 452 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) (citing *Stone v. Williams*, 358 S.W.2d 151, 155 (Tex. Civ. App.—Houston 1962, no writ)). Here, Munoz testified that Zorrilla specifically ordered him to construct a guest house and a structure connecting the guest house to the main house. Despite evidence that she was at the construction site daily, Zorrilla denied any knowledge of the guest house project. This denial of her earlier promise, coupled with

12

her ultimate refusal to pay the full contract price, were circumstances from which the jury could infer she never intended to perform.

In addition to the above, there was evidence that Zorrilla was repeatedly late in making payments to AYPCO. Munoz testified that Zorrilla would become angry when he questioned her about the late payments. There was also evidence from which the jury could conclude that Zorrilla had a habit or pattern of manufacturing reasons not to pay the contractors working on this project. As noted above, she adamantly denied any knowledge of the guest house project yet admitted paying invoices that specifically included costs for the guest house construction. She testified that she was rarely at the construction site, but the testimony of Munoz and others involved with the project placed her at the site on a daily basis. She claimed that she did not pay her first contractor because he did not charge her but was then confronted with her deposition in which she testified that she did not pay him because she was unsatisfied with his work. She refused to pay Palma, the first electrician on the project, because the wiring had been stolen while the reason for the stolen wiring was Zorrilla's dispute with the carpenter. There was even evidence that Zorrilla collected an insurance settlement for the stolen wiring, but still refused to pay Palma.[4] Finally, Munoz testified that Zorrilla told him she

---

[4] Although the testimony regarding the first contractor and electrician was evidence of misconduct prior to Zorrilla's contract with AYPCO, the evidence of the prior acts involved the same construction project and involved acts occurring less than two months prior to Zorrilla's contract with AYPCO. The Texas Supreme Court has held that

> Evidence of other wrongs or acts is not admissible to prove character in order to show "action in conformity therewith." TEX. R. EVID. 404. But it is admissible to show a party's intent, if material, provided the prior acts are "so connected with the transaction at issue that they may all be parts of a system, scheme or plan." *Oakwood Mobile Homes, Inc. v. Cabler*, 73 S.W.3d 363, 375 (Tex. App.—El Paso 2002, pet. denied); see TEX. R. EVID. 404. This can be shown through evidence of similar acts temporally relevant and of the same substantive basis. *See Durbin v. Dal-Briar Corp.*, 871 S.W. 2d 263, 268–69 (Tex.

did not have enough money to pay for the finished project, which was testimony from which the jury could infer that Zorrilla would pay as long as she had the money to pay, but that if she ran out of money, she may not pay anything further. In short, in light of the inconsistencies in Zorrilla's testimony, her refusal to pay earlier contractors, and her apparent disregard for maintaining adequate funding to finish out the project, it would not have been unreasonable for the jury to find a pattern of misconduct by Zorrilla, namely that she would routinely manufacture reasons to not pay for the work performed on this construction project. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011) (holding that evidence of prior acts of misconduct are admissible if they are so connected to the transaction at issue that they show a system, scheme, or plan); *see also Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 407, 424 (Tex. App.—Corpus Christi 2003), *rev'd on other grounds*, 164 S.W.3d 386 (Tex. 2005) (same). And the foregoing were all acts and circumstances from which the jury could have inferred that Zorrilla never intended to fully perform her obligation to fully pay AYPCO.[5]

Zorrilla also argues that her substantial performance on the contract—her payment of $366,000, which was significantly more than the $212,973 included in the original estimate—was an overriding fact that no reasonable juror could have ignored,

---

App.—El Paso 1994, writ denied), *overruled, in part, on other grounds by Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex.2000).

*Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011); *see also Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 407, 424 (Tex. App.—Corpus Christi 2003), *rev'd on other grounds*, 164 S.W.3d 386 (Tex. 2005). Here, as described above, we conclude that AYPCO adduced sufficient facts at trial connecting Zorrilla's prior acts to the transaction at issue such that a pattern of misconduct was shown.

[5] The foregoing could be considered circumstantial evidence of Zorrilla's intent at the time of the original contract's formation in November 2006 and her intent at the time of the requested modifications. Thus, whether Munoz complied with the terms of the contract—which required modifications to be in writing—is irrelevant to our conclusion.

and in light of that fact, any circumstantial evidence of fraud should have been disregarded. *See City of Keller*, 168 S.W.3d at 807. Again, we disagree. As discussed above, there was evidence that, if the circumstances were such that Zorrilla could not pay, she might not. It matters not that she paid part of the price. An essential element of the contract was full payment, and there was circumstantial evidence from which the jury could have inferred that she never intended to fulfill her entire obligation under the contract. The jury did not act unreasonably in crediting this circumstantial evidence over the evidence that Zorilla made partial payment; the law did not require jurors to entirely disregard the circumstantial evidence in light of Zorrilla's partial payment. *Cf. E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 124–25 (Tex. App.—El Paso 2007, no pet.) ("[T]he doctrine of substantial performance is not available to a party whose breach involves the omission of essential performance."); *Smith v. Smith*, 112 S.W.3d 275, 279 (Tex. App.—Corpus Christi 2003, pet. denied) (holding that while substantial performance can be used as a defense in a breach of contract case, in determining substantial performance, there must be no willful departure from the terms of the contract and no omission of essential elements of the contract).

We conclude there was both legally and factually sufficient evidence to support the jury's fraud verdict. Zorrilla's acts prior and subsequent to her promise to AYPCO were circumstantial evidence of her fraudulent intent, and we will not disturb the jury's determination in this regard. *See Aquaplex, Inc.*, 297 S.W.3d at 774–75; *Spoljaric*, 708 S.W.2d at 434–35 (holding that intent is a fact question uniquely within the realm of the trier of fact because it depends so heavily on the credibility of witnesses and the weight

15

given to their testimony); *see also Serv. Corp. Int'l*, 348 S.W.3d at 235. In other words, the circumstantial evidence detailed above, even if only slight, was sufficient to create more than a mere suspicion and supported a reasonable fact finder's conclusion that Zorrilla never intended to fully pay AYPCO. *See City of Keller*, 168 S.W.3d at 807, 827; *see also Aquaplex, Inc.*, 297 S.W.3d at 774–75; *IKON Office Solutions, Inc.*, 125 S.W.3d at 124. For the same reasons, we also cannot conclude that the evidence was so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Zorrilla's fifth issue is overruled.[6]

## III. Whether the Judgment Gave AYPCO a Double Recovery

By her sixth issue, Zorrilla argues that the trial court's award to AYPCO of both exemplary damages and attorney's fees violated the "one satisfaction rule" and allowed AYPCO to recover on both its fraud and breach of contract causes of action even though both theories involved a single injury.

When a defendant commits the same, or even differing, acts resulting in a single injury, a plaintiff is permitted to allege alternative theories of recovery. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184–85 (Tex. 1998); *see also Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000). However, under these circumstances, the plaintiff may not recover damages on both theories. *Waite Hill Servs., Inc.*, 959 S.W.2d at 184 (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). This would amount to a "double recovery" for a single injury, which is

---

[6] Having concluded that the fraud verdict was supported by legally and factually sufficient evidence, the jury's breach of contract verdict is not before us in this appeal. *See* TEX. R. APP. P. 47.1. Therefore, we do not reach Zorrilla's first and second issues that involve the breach of contract finding. *See id.*

16

clearly prohibited under the law. *See id.*

Here, AYPCO does not dispute that its breach of contract and fraud causes of action concerned the same conduct by Zorrilla and the same injury—Zorrilla's failure to pay the costs for the work done in May 2007 at the N. 23rd Street and Plaza del Lago properties and the costs incurred by AYPCO as a result. And the dispute in this case does not concern the double recovery of economic damages. Neither party disputes that AYPCO was entitled to recover either its breach of contract damages or its fraud damages, but not both. Because AYPCO elected to recover under its fraud theory, it was entitled only to its fraud damages.

Rather, Zorrilla's argument is that by allowing AYPCO to recover both attorney's fees—which are typically permitted only in breach of contract cases or other cases authorized by statute—and exemplary damages—which are typically permitted only for tortious conduct, such as fraud—the trial court allowed AYPCO to recover under both theories when it was required to pick only one. In response, AYPCO contends that attorney's fees were recoverable for its fraud claim because the fraud arose from a breach of contract. *See Schindler v. Austwell Farmers Co-op*, 829 S.W.2d 283, 288 (Tex. App.—Corpus Christi 1992) (holding that attorney's fees are recoverable for fraud claims when the fraud arises from breach of contract), *aff'd as modified on other grounds*, 841 S.W.2d 853 (Tex. 1992).

Contrary to AYPCO's contention, in general, attorney's fees are not recoverable in a fraud claim, even when the fraud arose from a breach of contract. *See MBM Fin. Corp.*

17

*v. Woodlands Operating Co.*, 292 S.W.3d 660, 667–68 (Tex. 2009)[7]; *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, No. 08–11–00092–CV, 2012 WL 2627533, at *16 (Tex. App.—El Paso July 5, 2012, pet. denied) ("For fraud, a party could recover economic damages, mental anguish, and exemplary damages, but not attorney's fees.").   As such, under its fraud election, AYPCO was entitled to recover its economic damages and exemplary damages, but not attorney's fees.   In also awarding AYPCO attorney's fees, the trial court allowed AYPCO to recover something it would only have been permitted to recover under its breach of contract theory.   *See MBM Fin. Corp.*, 292 S.W.3d at 667–68; *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 310–11 (holding that Texas follows the American Rule, which provides that there can be no recovery of attorney's fees unless authorized by contract or statute); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2008). This was an impermissible double recovery, and the trial court's judgment in this regard is erroneous.   *See Waite Hill Servs., Inc.*, 959 S.W.2d at 184–85.   We sustain Zorrilla's sixth issue.

## IV.   Amount of Exemplary Damages

By her seventh issue, Zorrilla challenges the amount of exemplary damages awarded by the jury.   Specifically, Zorrilla argues that the amount of exemplary damages:   (1) exceeds the statutory cap and should be reduced accordingly; (2) violates both the United States and Texas constitutions; and (3) was not supported by the evidence.

---

[7] The Texas Supreme Court's holding in *MBM Financial*, that attorney's fees are generally not recoverable for a fraud action even when the fraud arises from a contract, overrules this Court's broad holding in *Schindler* to the contrary.   *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 667–68 (Tex. 2009); *Schindler v. Austwell Farmers Co-op*, 829 S.W.2d 283, 288 (Tex. App.—Corpus Christi 1993), *aff'd as modified on other grounds*, 841 S.W.2d 853 (Tex. 1992).

18

## A. The Statutory Cap

Under civil practice and remedies code section 41.008,

[e]xemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)  (A)  two times the amount of economic damages; plus

(B)  an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2)  $200,000.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (West Supp. 2011). The cap does not apply when a plaintiff seeks recovery of exemplary damages based on certain felony criminal conduct enumerated in subsection 41.008(c), i.e., "cap-busting" conduct. *See id.* § 41.008(c)(1)–(17). Here, under the statute, AYPCO's exemplary damages would have been capped at $200,000.

Citing Texas Rule of Civil Procedure 94, this Court has held that the statutory cap on exemplary damages is an affirmative defense and the defendant must specifically plead it or else it is waived. *Wackenhut Corrections Corp. v. De La Rosa*, 305 S.W.3d 594, 651, 653 (Tex. App.—Corpus Christi 2009, no pet.); *see* TEX. R. CIV. P. 94 ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense."). In so holding, we reasoned that "a defendant's pleading of an affirmative defense puts the plaintiff on notice that the affirmative defense needs to be *defeated*, and it allows the plaintiff to structure his or her case in order to defeat the affirmative defense, if possible"; in other words, with regard to the statutory cap in particular, a plaintiff is "entitled to notice that [the defendant] intend[s]

19

to assert the cap so that its case [can] be structured to present a 'cap-busting' theory." *Wackenhut Corrections Corp.*, 305 S.W.3d at 652–53.

Zorrilla concedes that she did not specifically plead the statutory cap as an affirmative defense, instead raising it for the first time in her motion for new trial. She asserts that under *In re Columbia Medical Center of Las Colinas*, her motion for new trial was sufficient to raise the issue of the cap. *See* 306 S.W.3d 246, 247–48 (Tex. 2010) (per curiam). In *In re Columbia*, the supreme court addressed an issue raised by its mandate in a prior proceeding in the same case. *Id.* at 247. The supreme court's mandate in the prior case reduced the plaintiff's economic damages award. *Id.* After issuance of the mandate, the defendant attempted to make payment to the plaintiff of the amount of economic and punitive damages affirmed by the supreme court, but the plaintiff refused payment. *Id.* The defendant filed a motion in the trial court "requesting [a judgment] that would effectuate [the supreme court's] mandate by reducing the economic damages award appropriately, as well as by reducing the punitive damages award to twice the amount of the economic damages award [the supreme court] affirmed, plus interest." *Id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b)(1). The trial court denied the defendant's motion, and the defendant then filed a petition for mandamus with the supreme court. *In re Columbia*, 306 S.W.3d at 247. Noting that "[p]unitive damages awards *that are statutorily capped* are required to be recalculated when the actual damages against which they are measured are reduced on appeal," the supreme court held that

> regardless of whether an appellate court judgment expressly commands it, trial courts must give effect to statutory caps on damages when the parties

20

raise the issue. Accordingly, to give full effect to our judgment vacating a portion of economic damages, the trial court was required to reduce the punitive damages award in compliance with the statutory cap.

*Id.* at 248 (emphasis added).

Because the supreme court applied the statutory cap "as a matter of law" when the defendant had raised the issue "in a post-trial motion," Zorrilla argues that the implicit holding of *In re Columbia* is that the statutory cap is not an affirmative defense and can be raised by the defendant at any point. *See id.*; *see also THI of Tex. at Lubbock I, LLC v. Pena*, 329 S.W.3d 548, 588 (Tex. App.—Amarillo 2010, pet. denied) (citing *In re Columbia* in holding that the statutory cap is not an affirmative defense). In short, Zorrilla argues that *In re Columbia* overruled our holding in *Wackenhut*. We disagree—*In re Columbia* takes no such position on the procedural requirements of the statutory cap.

While it is true that the supreme court was addressing the statutory cap pursuant to a motion filed by the defendant after the supreme court issued its mandate in the underlying case, the time and manner by which the cap was raised by the defendant are not entirely clear. From the facts set forth in *In re Columbia*, we cannot eliminate the possibility that the statutory cap was raised before trial. Indeed, in its description of the underlying proceeding, the supreme court actually implied that the cap had been raised earlier. *In re Columbia*, 306 S.W.3d at 247 (citing the statutory cap in its discussion of the original economic and punitive damages awards). Regardless, without more certainty regarding the procedural history of the underlying case, we are not persuaded by this portion of Zorrilla's reasoning.

Neither are we persuaded that the phrase "applies as a matter of law" overrules

21

the opinions of our court and other courts of appeal holding that the statutory cap must be affirmatively pled. *See Wackenhut*, 305 S.W.3d at 651–53; *Horrizon/CMS Healthcare Corp. v. Auld*, 985 S.W.2d 216, 233 (Tex. App.—Fort Worth 1999), *rev'd in part on other grounds*, 34 S.W.3d 887 (Tex. 2000). Rather, as mentioned above, the supreme court made no clear pronouncement on the issue. In short, our justification in *Wackenhut* remains—the purpose of requiring the statutory cap to be affirmatively pled is allowing the plaintiff opportunity to structure its case in response.

Finally, Zorrilla argues that the procedural facts of this case do not support the application of *Wackenhut*'s reasoning because AYPCO had no potential cap-busting theories. Even if AYPCO did not initially allege cap-busting conduct, given the ever-evolving nature of litigation, it was not outside the realm of possibility that discovery would uncover cap-busting conduct—for example, securing execution of documents by deception, forgery, fraudulent destruction, removal or concealment of a writing, or theft, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(c)(8), (11), (12), (13)—connected with the alleged fraud. Because Zorrilla did not plead the statutory cap, AYPCO had no reason to seek evidence of cap-busting conduct. As such, the rationale of *Wackenhut* certainly applies; AYPCO was entitled to notice that Zorrilla was asserting the statutory cap so that it could structure its strategy and proof at trial accordingly.

In sum, we are not persuaded that *In re Columbia* conflicts with our holding in *Wackenhut*, and we therefore decline to overrule our precedent in that case. Thus, following *Wackenhut*, we conclude that Zorrilla waived application of the statutory cap on exemplary damages by failing to expressly plead it as an affirmative defense. *See* 305

22

S.W.3d at 652–53. Zorrilla's seventh issue is overruled insofar as it depends on this argument.

## B.  Constitutionality of the Amount

Having concluded that AYPCO's exemplary damages award was not subject to the statutory cap, we next address Zorrilla's argument that the $250,000 awarded by the jury as exemplary damages was unconstitutional.

"The Due Process Clause 'prohibits a [s]tate from imposing a grossly excessive punishment on a tortfeasor.'"  *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998) (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 562 (1996)).  In reviewing exemplary damages, we consider three guideposts:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the exemplary damages award; and (3) the difference between the exemplary damages awarded by the jury and the civil or criminal penalties authorized or imposed in comparable cases.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *Malone*, 972 S.W.2d at 45; *Tony Gullo Motors*, 212 S.W.3d at 308–09.

### 1.  Reprehensibility

The reprehensibility of the defendant's conduct is the "most important indicium of the reasonableness of a punitive damages award." *Campbell*, 538 U.S. at 419.  In assessing reprehensibility, we consider whether the following factors are present:  (1) the plaintiff's health or safety, as opposed to its economic well-being, was endangered; (2) the tortious conduct evidenced a reckless disregard for or indifference to the health or

23

safety of others; (3) the plaintiff was financially vulnerable; (4) the conduct was repeated; and (5) the injury was the result of malice, trickery, or deceit. *Id.* Further, "a reprehensibility analysis can . . . consider, to some extent, surrounding circumstances beyond the underlying tort," particularly if those surrounding circumstances "go to motive, underscore the parties' animosity, shed light on provocation, demonstrate deliberateness and culpability, and otherwise show heightened reprehensibility." *Bennett v. Reynolds*, 315 S.W.3d 867, 875 (Tex. 2010). Although "a jury cannot use exemplary damages to punish a defendant for harming nonparties," "related conduct 'may be probative when it demonstrates the deliberateness and culpability of the defendant's action,' provided that the conduct bears 'a nexus to the specific harm suffered by the plaintiff.'" *Id.* at 875–76 (quoting *Philip Morris USA v. Williams*, 549 U.S. 346, 353, 355 (2007); *Campbell*, 538 U.S. at 422).

Here, although it is true that the harm to AYPCO was purely economic, there was evidence of conduct by Zorrilla bearing on two of the other reprehensibility factors. First, having upheld the jury's fraud finding in which it was determined that Zorrilla made an intentional material misrepresentation, it is clear that her conduct rose to the level of trickery or deceit contemplated by the fifth factor.[8] Second, there was evidence that Munoz and AYPCO were financially vulnerable. Munoz testified that Zorrilla's late payments put a strain on his finances because he had to pay his workers whether or not Zorrilla made her payments. Munoz testified that he essentially bankrolled the project as a result of the late payments, which eventually ruined his personal and commercial credit.

---

[8] Zorrilla concedes in her brief that if we were to find the evidence sufficient to support AYPCO's fraud claim, the trickery and deceit factor "would apply because AYPCO's fraud claim predicated exemplary damages on Zorrilla intentionally deceiving AYPCO."

24

Because of the financial burden of Zorrilla's project, Munoz lost his cars and his home in foreclosure proceedings. Finally, there was evidence that Zorrilla was aware of Munoz and AYPCO's financial vulnerability; Munoz testified that he explained to Zorrilla that he had to have payment from her to ensure that his workers were paid at the end of each week. As a result, Zorrilla arguably had knowledge that Munoz did not have a large reserve of capital from which to pay his workers if Zorrilla did not make her payments.

In addition to the reprehensibility factors, there was evidence of surrounding circumstances that further demonstrated Zorrilla's deliberateness and culpability. As described above, Zorrilla failed to pay the contractor who worked on the project before AYPCO and gave conflicting explanations for the failure to pay, one of which that she was merely unsatisfied with the manner in which the project was being supervised. There was also evidence that Zorrilla refused to pay Palma, the electrician who worked on the house before AYPCO took over the project, because the wiring was stolen as a result of her dispute with the then-carpenter. In other words, Zorrilla refused to pay Palma for reasons beyond Palma's control. What's more, there was evidence that Zorrilla had collected an insurance settlement for the stolen wires and still refused to pay Palma.

Although the foregoing is evidence of misconduct against non-parties, we believe it has a sufficient nexus to the harm suffered by Munoz and AYPCO. The earlier conduct concerned the same construction project. It was circumstantial evidence of a pattern of deceit by Zorrilla in her interactions with the parties performing the work on her homes. In short, it evinced a heightened level of reprehensibility above that shown by the evidence related to Munoz and AYPCO alone. Thus, it was proper for the jury to

25

consider these surrounding circumstances in their determination of the amount of exemplary damages.

## 2. The Ratio Between the Exemplary and Compensatory Damages

As to the second guidepost, we note that courts have held that a single-digit ratio between the exemplary and actual damages would "more likely" comport with due process, with the upper limit of that single-digit ratio generally considered to be four times the amount of compensatory damages. *See id.* at 877; *see also Campbell*, 538 U.S. at 425; *see, e.g., Malone*, 972 S.W.2d at 46–47 (affirming an exemplary damages award of "slightly more than" two times the compensatory damages). However, we also recognize that there is no "bright-line ratio" between the actual damages suffered and punitive damages awarded that will mandate the affirming or reversal of an award. *See Campbell*, 538 U.S. at 424–25; *see also Bennett*, 315 S.W.3d at 879 ("[R]igid application of a 4:1 ratio is not universally required.").

Here, the exemplary damages award ($250,000) was 4.41 times the amount of compensatory damages ($56,654.15). Given the reprehensibility of Zorrilla's conduct, as described above, we do not believe that a ratio 0.41 points greater than the 4 to 1 ratio suggested by the supreme court runs afoul of the due process clause in this case.[9] In other words, the disparity between the actual harm suffered by AYPCO and the exemplary damages awarded was not so great as to violate Zorrilla's due process rights.

---

[9] Zorrilla contends that the 4.41 to 1 ratio in this case is akin to the 4.33 to 1 ratio held by the supreme court to be unconstitutionally excessive in *Tony Gullo Motors I, Inc. v. Chapa*. *See* 212 S.W.3d 299, 308–10 (Tex. 2006). But in that case, the supreme court concluded that the 4.33 to 1 ratio was impermissible because only one of the reprehensibility factors was present. *Id.* Here, there was evidence of two reprehensibility factors and additional evidence of surrounding circumstances such that we cannot conclude that a ratio of 4.41 to 1 is excessive.

### 3.   The Penalty Comparison

The third and final guidepost requires the Court to examine the civil and criminal penalties authorized or imposed in comparable cases.   See *Campbell*, 538 U.S. at 428; *Malone*, 972 S.W.2d at 45.   Here, the most comparable civil penalty we found is the $20,000 penalty in the Deceptive Trade Practices Act for fraud connected with a consumer transaction.   *See* TEX. BUS. & COM. CODE ANN. § 17.47(c) (West 2011).   If there were no comparable civil penalty, we could also consider the statutory damages cap, which as discussed above, would have been $200,000 in this case.   *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 41.008(b).   The jury's $250,000 exemplary damages award exceeded both of these comparators.   However, the fraud of deceptive business practices is also a crime, and the criminal punishment for this offense includes a possible prison sentence.   *See* TEX. PENAL CODE ANN. § 32.42(b)(12) (West 2011) (criminalizing a material misrepresentations made in connection with the purchase of services as a class A misdemeanor); *see also id.* § 12.21 (West 2011) (prescribing the punishment for a class A misdemeanor as a fine up to $4,000 and a jail term of up to one year).   The loss of one's liberty and a criminal conviction are greater consequences than any monetary penalty.   *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991) (suggesting that although the punitive damages in the case were twenty times greater than the comparable civil fine, the possibility of imprisonment for the comparable criminal violation was a greater concern).

### 4.   Summary

Our analysis of the three guideposts weighs in favor of the exemplary damages

27

awarded by the jury. First, with regard to the reprehensibility guidepost, Zorrilla's conduct amounted to trickery and deceit, there was evidence that Munoz was financially vulnerable, and there was evidence of surrounding circumstances demonstrating a pattern of deceit by Zorrilla. Second, the 4.41 to 1 ratio of exemplary to compensatory damages was not per se unacceptable. Third, the potential imprisonment in connection with a criminal fraud conviction is of greater consequence than the monetary penalty imposed by the exemplary damages award, so the final guidepost weighs in favor of the exemplary damages awarded. We therefore conclude that the exemplary damages in this case did not violate Zorrilla's due process rights. *See Campbell*, 538 U.S. at 418; *Malone*, 972 S.W.2d at 45; *Tony Gullo Motors*, 212 S.W.3d at 308–09. Zorrilla's seventh issue is overruled in this regard.

## C. Evidence Supporting the Amount

Zorrilla's final argument in her seventh issue is that the amount of exemplary damages awarded by the jury was not supported by factually sufficient evidence.

> We must review an award of exemplary damages with careful scrutiny to ensure it is supported by the evidence, and we may vacate the award or suggest a remittitur only if the award is "so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." *Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc.*, 138 S.W.3d 915, 928 (Tex. App.—Dallas 2004, pet. struck) (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1994)). In order to determine if the exemplary damages awarded were reasonable, we consider the factors set forth in *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981), which include the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety. *Signal Peak*, 138 S.W.3d at 928; *see also* [*SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 305 (Tex. App.—Dallas 2005, pet. denied)].

*Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 767 (Tex. App.—Dallas 2008, no pet.).

For primarily the same reasons we found them to be constitutional, we also believe the exemplary damages awarded were supported by the evidence. Here, although the harm to Munoz and AYPCO was economic, the evidence showed intentional acts of deception by Zorrilla in both her dealings with AYPCO and her dealings with other parties involved in the construction of her homes. The evidence showed that Munoz and AYPCO were financially vulnerable, that Zorrilla was aware of this vulnerability, and that Zorrilla's actions ruined Munoz's personal and commercial credit. Zorrilla's pattern of deceptive dealings with the various parties involved was offensive to public notions of fairness and propriety. In short, the evidence showed a degree of culpability on the part of Zorrilla that rendered the exemplary damages awarded by the jury reasonable, and we cannot conclude that the award was so against the great weight and preponderance of the evidence as to be manifestly unjust. Zorrilla's seventh issue is overruled in this final regard.

## V. Pre-judgment Interest

By her third issue, Zorrilla argues that the trial court erred in awarding AYPCO prejudgment interest under the Prompt Payment to Contractors Act (the Prompt Payment Act) because AYPCO failed to prove it was contractually entitled to any payment for the work performed in May 2007. *See* TEX. PROP. CODE ANN. § 28.002 (West 2000) (providing for 1.5% prejudgment interest in a case where a property owner fails to pay a contractor the agreed-upon amount within thirty-five days of payment request). Zorrilla predicates this issue on her first issue, in which she argued that the evidence was

insufficient to support the jury's breach of contract finding. However, because AYPCO elected its fraud damages and because we have found the evidence sufficient to support the jury's fraud verdict, the jury's breach of contract finding is not before us in this appeal. *See* TEX. R. APP. P. 47.1. Regardless, because the measure for breach of contract and fraud damages submitted to the jury were identical, as discussed supra in Part III, we conclude that the jury's answer to the fraud damages question established that AYPCO was entitled, under an agreement between it and Zorrilla, to payment for the work in May 2007. Accordingly, when it proved that Zorrilla did not make timely payment on that agreement under the fraud charge, AYPCO became entitled to the prejudgment interest available in the Prompt Payment Act. *See* TEX. PROP. CODE ANN. § 28.002(a). The trial court therefore did not err in including prejudgment interest under the Act in the judgment. Zorrilla's third issue is overruled.

## VI. Mechanic's Liens

By her fourth issue, Zorrilla argues that the trial court erred in foreclosing on a constitutional lien on the Plaza del Lago property and a statutory lien on the N. 23rd Street property. Zorrilla argues that both liens "require at least proof of a contractor's performance and the existence of a debt." *See AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 522 (Tex. App.—Fort Worth 2009, no pet.) (constitutional lien); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 59 (Tex. App.—San Antonio 2005, pet. denied) (statutory lien). As in her prejudgment interest issue, Zorrilla predicates this argument on her first issue, in which she argued that the evidence was insufficient to support the jury's breach of contract finding. However, we

30

note, again, that because AYPCO elected its fraud damages and because we have found the evidence sufficient to support the jury's fraud verdict, the jury's breach of contract finding is not before us in this appeal. See TEX. R. APP. P. 47.1. Regardless, for the same reasons we upheld the trial court's inclusion of prejudgment interest under the Prompt Payment Act, we likewise conclude that the jury's fraud finding, which was supported by the evidence, was sufficient to satisfy the requirement that there was proof of AYPCO's performance and the existence of a debt from Zorrilla's failure to pay.

With regard to the constitutional lien, in particular, Zorrilla asserts that the Plaza del Lago home was her homestead and argues that AYPCO failed to provide the trial court with proof that the requirements for filing a constitutional lien against a homestead were complied with. *See* TEX. CONST. art. XVI, § 50(a)(5)(A)–(D) (providing that a constitutional lien may not be enforced against a homestead unless the homeowner, among other requirements, signs a written contract for labor that includes an express three-day rescission period and the contract is recorded). The plea of homestead is an affirmative defense and the burden of pleading and proving such a defense rests upon the party asserting it. *Watson v. Tipton*, 274 S.W.3d 791, 800 (Tex. App.—Fort Worth 2008, pet. denied); *Bennett v. State Nat'l Bank, Odessa, Tex.*, 623 S.W.2d 719, 722 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Here, Zorrilla never pleaded that the Plaza del Lago property was her homestead. In fact, we note that in her motion for new trial, Zorrilla argued that the statutory lien on the N. 23rd Street property was not properly executed under the requirements for liens on homesteads, which suggests that at the time of that motion, Zorrilla claimed the N. 23rd Street property as her homestead.

31

*See McKee v. Wilson*, 174 S.W.3d 842, 844 (Tex. App.—Waco 2005, no pet.) (citations omitted) (holding that once a homestead is established, it is presumed to continue until it is abandoned, which requires proof of an intent not to return to the previous homestead and overt acts consistent with that intent). The only evidence in the record relevant to this argument is Zorrilla's testimony at trial that she lived in the Plaza del Lago home while the N. 23rd Street home was being constructed. This testimony was not sufficient to show a "concurrence of usage and intent on the part" of Zorrilla to "claim the land as a homestead," especially in light of her motion for new trial. *See Salomon v. Lesay*, 369 S.W.3d 540, 554 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (internal quotations omitted); *see also McKee*, 174 S.W.3d at 844. Because Zorrilla did not plead and prove that the Plaza del Lago property was her homestead, she cannot complain on appeal, with regard to that property, of AYPCO's failure to comply with constitutional requirements for liens against homesteads.

In sum, we conclude that the trial court did not err in ordering foreclosure on AYPCO's constitutional and statutory liens. Zorrilla's fourth issue is overruled.

## VII. Conclusion

We modify the judgment to delete the award of attorney's fees and affirm the judgment as modified.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 3rd
day of October, 2013.

32