NO. 07-03-0307-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

FEBRUARY 14, 2005
_____

MABEL WALTER ROGERS, LARRY FRANK WALTER, co-trustee, ROBERT
WAYNE VEIGEL, co-trustee, DOROTHY ANN VEIGEL OSWALD
and JO ANN VEIGEL EUDY,

Appellants

v.

IN RE: ARDELLA VEIGEL INTER VIVOS TRUST NO. 2,
AMARILLO NATIONAL BANK, AMARILLO, TEXAS, co-trustee,

Appellees
_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 84,743-E; HON. ABE LOPEZ, PRESIDING
_____

*Opinion*
_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

Robert Wayne Veigel (R.W.) appeals from a summary judgment in favor of Amarillo

National Bank (ANB).[1]  Via four issues, he contends that the trial court erred in granting

_____

[1]According to an "Order on Status of Case" rendered by the trial court on April 14, 2003, all other Respondents/Appellants filed non-suits in the above-referenced matter.  Therefore, their claims against ANB had "been dropped from this cause."

summary judgment based on the statute of limitations which prevented him from 1) pursuing his counterclaims and 2) requesting an accounting. We affirm.

## *Background*

The dispute before us concerns various estates, trusts, and management agreements. Charles R. Veigel died (in 1967) leaving a wife (Ardella), two children (Robert and Mabel) and a will. R.W. is the grandchild of Charles.

Through his will, Charles "devise[d] and bequeath[ed]" to Robert "for and during his lifetime" various specific "lands and premises . . . for and during his life only, . . . to have the right of possession, use and occupancy of said lands and the proceeds from the rents and revenues thereof . . . during his lifetime." A like bequest in other specific land was given to Mabel "for and during her lifetime" as well. Next, Charles named his grandchildren and great-children as remaindermen. Yet, to the extent that a remainderman was under the age of 25 when his or her respective interest accrued, he also directed that it be held in trust until the beneficiary became 25, and designated ANB the trustee of the trust until that time.

Again, Charles died in 1967 and was survived by his wife Ardella, Robert, Mabel, and various grand and great-grandchildren, including R.W. Thereafter, in 1968, Ardella created two inter vivos trusts, naming ANB and Robert as trustees. Through the instrument forming trust No. 1, she designated Robert as beneficiary, while Mabel was designated beneficiary of trust No. 2. Furthermore, each beneficiary was vested with the right to the net income, during their "lifetime," of various properties forming the corpus of their respective trust. Ardella's grand and great-grandchildren were designated the remaindermen.

2

In 1968, Ardella executed one other agreement pertinent to this appeal. The parties to it were Ardella as well as Mabel, Robert, the Ardella trusts Nos. 1 and 2, and ANB. Through it, ANB and Robert obtained the authority to manage the interests of the named parties in the realty bequeathed by Charles to Robert and Mabel as well as that held in Ardella's two inter vivos trusts. The agreement was to remain binding through the end of the existing crop year "or the death of the earlier to die of Robert . . . and Mabel . . . ." Moreover, upon the death of both or either Robert or Mabel, their respective remaindermen were given the option to "continue this arrangement for a specified period."

The parties operated under the foregoing management agreement for some time. Eventually, however, and after the death of Ardella in 1974 and Robert in 1993, discord began to develop between R.W. and ANB. The discord was made manifest in 1994 when R.W. raised questions regarding whether ANB received trustee fees to which it was unentitled; R.W. queried whether ANB was not entitled to the fees because Charles actually granted Robert and Mabel a life estate in the realty mentioned in his will as opposed to a life interest in a trust. According to R.W., ANB had received and held the realty as if it was the corpus of a trust which it had no right to do under Charles' will.

Several years later, that is, in 1998, ANB sued to be removed as trustee of the Ardella trust No. 2 and of the trust purportedly created under Charles' will and of which Robert and Mabel were beneficiaries. R.W. answered with a motion to transfer venue, a general denial, and a specific denial wherein he alleged that he "denies that [ANB] should be removed as Trustee at this time, in that there is a question as to acts of the Trustee under Ardella['s] . . . Intervivos Trust No. 2" and "under the estate of Charles . . . ."

3

In July of 1999, R.W. later amended his answers to include a counterclaim seeking damages and an accounting from ANB. Thereafter, ANB moved for summary judgment (which motion was supplemented several times) contending that limitations had expired upon those claims founded upon breached fiduciary duty and that no evidence existed supporting the allegation of mismanagement. So too did R.W. seek summary judgment. Through his motion, he asked for judgment declaring that the interests bequeathed to Mabel and Robert via Charles' will were actually life estates, as opposed to a life interest in a trust. The trial court granted ANB's "First Summary Judgment Motion, as amended and supplemented," and denied that of R.W. After his motion for new trial was overruled by operation of law, R.W. appealed.

### Issue Three – Life Estate or Trust Interest

Issue three affects our resolution of other issues raised by R.W. So, we address it first. Furthermore, under it, R.W. contends that the interests bequeathed by Charles to Robert and Mabel were not interests in a trust for the life of those two individuals. That is, according to R.W., the provision did not create a trust but instead granted the interests free of any trust. We sustain the point.

It is settled that in construing a will, the court must focus on the testator's intent. *San Antonio Area Foundation v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000); *In re Dillard*, 98 S.W.3d 386, 391-92 (Tex. App.–Amarillo 2003, pet. denied). Furthermore, that intent is drawn from the will, not the will from the intent. *San Antonio Area Foundation v. Lang*, 35 S.W.3d at 640; *In re Dillard*, 98 S.W.3d at 391-92. In other words, the testator's intent must be discovered from the language found within the four corners of the will and, the focus lies not upon what the testator intended to write, but rather the meaning of the words actually

4

written.  *San Antonio Area Foundation v. Lang*, 35 S.W.3d at 639; *In re Dillard*, 98 S.W.3d at 391-92.  Nevertheless, where words are open to more than one construction, evidence of the testator's situation, the surrounding circumstances, and like indicia which enable the court to place itself in his shoes *at the time the document was executed* may be admissible. *San Antonio Area Foundation v. Lang,* 35 S.W.3d at 639.  This is so because they may facilitate the determination of intent at that time.  But, again, this exception applies only when words are susceptible to more than one construction.  *San Antonio Area Foundation v. Lang*, 35 S.W.3d at 641; *In re Dillard*, 98 S.W.3d at 391-92.  If they are not, then the court can look to nothing other than the face of the instrument.  *In re Dillard*, 98 S.W.3d at 391-92.

As previously mentioned, Charles devised to Robert and Mabel "for and during [their] lifetime" various "lands and premises . . . for and during [their] life only . . . to have the right of possession, use and occupancy of said lands and the proceeds from the rents and revenues thereof . . . during [their] lifetime."  Nothing was said in this passage about a trustee gaining the rights to possess, use and occupy the property on behalf of them and during their life.  Rather, Charles expressly gave those rights to Robert and Mabel. Moreover, like words were used elsewhere in the will.  For instance, in disposing of the remainder interest, Charles alluded to 1) the "real property described in the preceding sections FIFTH and SIXTH in which my son or daughter . . . held a *life estate,*" 2) "all of the property above described in which my son, Robert . . ., is granted a *life estate,*" and 3) "all of the property above described in which my daughter, Mabel . . ., is granted a *life estate.*" (Emphasis added).

5

Next, that Charles knew how to create a trust when he so desired is obvious from other provisions of the will. For instance, not only did he expressly create a charitable trust but also trusts to hold the interests remaining after the termination of the life estates granted Robert and Mabel.[2] That is, he directed that the remainder interests in those properties were to go to various grand and great-grandchildren of Charles. However, if any of those grand or great-grandchildren were "less than twenty-five . . . years of age," then the respective interest would "pass to and vest in AMARILLO NATIONAL BANK, as Trustee, to be held and used for the benefit of such remainderman . . . until such beneficiary reaches the age of twenty-five . . . ."

Thus, from the face of the will itself we see various key indicia. First, in making the bequests to Robert and Mabel, Charles said nothing about placing the life interests in trust for their benefit. Instead, his words were quite clear and unambiguous. They specified that Robert and Mabel were being "granted a life estate." Second, when he desired to place an interest in trust, he did just that in a clear and unambiguous way. So, in view of the language appearing in his will and the plain, ordinary meaning we assign to it, *Steger v. Muenster Drilling Co., Inc.,* 134 S.W.3d 359, 372 (Tex. App.–Fort Worth 2003, pet. denied) (stating that the words of a will must be given their plain meaning), we cannot but hold that Charles intended that the property interests he gave to Robert and Mabel were to be held free of any trust.

---

[2]The charitable trust is irrelevant to the issues before us. So, we will not address it.

And, our conclusion is not affected by that language in paragraphs five and six of the will wherein Charles discussed who was to have the right to execute mineral leases.[3] Through it, he explained that neither Robert nor Mabel were to have that right. Instead, his remaindermen were to enjoy it, as evinced by his statement that "[d]uring the life of Robert . . . [and Mabel] . . . the then living adult remaindermen . . . together with AMARILLO NATIONAL BANK, Trustee, but without the joinder of Robert [or Mabel] . . . shall have the exclusive right to execute and deliver oil, gas or mineral leases, . . . ." These words say nothing more than the remaindermen have the sole right to sever the minerals from the surface. And, to the extent that an adult remainderman may nonetheless be under 25 years old, ANB, as trustee, shall also have the right to do so on their behalf. There is no ambiguity. Nor does the passage create ambiguity elsewhere in the will.

Given our construction of the will, we conclude, as a matter of law, that R.W. was entitled to a summary judgment declaring that Charles granted the life estates to Robert and Mabel free of trust. And, our judgment will so reflect.

### Issues One, Two, and Four – Statute of Limitations

In his first and second issues, R.W. claims the trial court erred in granting summary judgment because his claim to recover administrative fees paid to ANB with respect to the life estates and to obtain an accounting were not barred by limitations. In his fourth issue, he asserts that his claim for damages also remained viable. We overrule the issues.

Through his live pleading, R.W. contended that ANB breached various fiduciary duties related to its post as trustee under Charles' will, as trustee of Ardella's inter vivos

---

[3]The language of which we speak, according to ANB, created a fact question as to Charles' intent regarding the placement of the life estates in trust.

and testamentary trusts, as executor of the estates of Charles and Ardella, and as operator under the management agreement. Due to these purported breaches of trust, R.W. believed himself entitled to damages, the return of fees paid to ANB, and an accounting of all income and expenditures made by ANB while acting in a fiduciary capacity.

*Disgorgement of Fees*

According to R.W., the trial court erred in concluding that limitations barred his claim to recover the fees paid to ANB for acting as trustee over the life estates granted Robert and Mabel under Charles' will. This was allegedly so because §114.061(b) of the Texas Property Code permitted such a recovery.[4] The issue, however, is moot.

As illustrated by the wording of §114.061(b), the statute concerns fees paid a trustee. Moreover, not only is the provision found in that section of the Property Code concerning trusts, but also its application is limited only to express trusts. *See* TEX. PROP. CODE ANN. §111.006 (Vernon 1995) (describing the "trusts" to which the subtitle, wherein §114.061 is found, applies); *Id.* §111.003 (defining the word "trust," for purposes of the subtitle, as an "express trust only"). So, in view of our previous holding that the grant by Charles to Robert and Mabel did not create a trust, we must conclude that R.W. cannot invoke §114.061(b) to recoup administrative fees allegedly paid ANB.

*Accounting*

Next, the trial court purportedly erred in holding that limitations barred his action for accounting given the wording of §113.151(a) of the Property Code. The latter obligates, under certain circumstances, a trustee to account for all transactions "since the last

---

[4]Section 114.061(b) provides that "[i]f the trustee commits a breach of trust, the court may . . . deny him all or part of his compensation." TEX. PROP. CODE ANN. §114.061(b) (Vernon 1995).

accounting or since the creation of the trust. . . ." TEX. PROP. CODE ANN. §113.151(a) (Vernon Supp. 2004-05). And, since no accounting allegedly had been provided by ANB since the inception of any trust, limitations did not free the bank from accounting for all transactions since the trusts were created. Yet, the record illustrates that in attempting to avoid summary judgment below, R.W. simply contended that because the estates of Charles and Ardella had yet to be closed, limitations had not begun to run. Nothing was said about §113.151(a) of the Property Code or its effect, if any, on the trusts at bar or ANB's entitlement to summary judgment.

Our Supreme Court has declared, via Texas Rule of Civil Procedure 166a(c), that ""[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c); *accord Burnam v. Patterson*, 119 S.W.3d 12, 15 (Tex. App.–Amarillo 2003, pet. denied) (so holding). Since R.W. failed to expressly urge, before the trial court, §113.151(a) as a ground for defeating summary judgment, that ground cannot serve as a basis to secure reversal on appeal. In short, the contention was waived. *Dubose v. Worker's Medical, P.A.,* 117 S.W.3d 916, 920 (Tex. App.–Houston [14th Dist.] 2003, no pet.).

*Damages*

Next, R.W. proffers two reasons purportedly illustrating why the trial court erred in holding that limitations barred his claim for damages. They involve §16.069 of the Texas Civil Practice and Remedies Code and the theory of continuing tort. We initially address the former.

9

*§16.069*

Per §16.069, one may assert as a counterclaim a cause of action that previously fell victim to limitations. To do so, however, the counterclaim must 1) arise from the same transaction or occurrence underlying the original claim, TEX. CIV. PRAC. & REM. CODE ANN. §16.069(a) (Vernon 1997), and 2) be filed no later than 30 days after the date on which the party's answer is required. *Id.* §16.069(b). All agree that the first document entitled "counterclaim" and submitted by R.W. was filed long after the expiration of the time period described in §16.069(b). Yet, this does not matter, according to R.W., for he filed other pleadings within the applicable window which purportedly included a counterclaim. The pleadings in question were his answers to ANB's original petitions, and the allegation supposedly satisfying the prerequisites of a counterclaim consisted of the averments wherein he "denie[d] that Plaintiff should be removed as Trustee at this time, in that there is a question as to acts of the Trustee under the estate of Charles R. Veigel" and the "Ardella Veigel Inter Vivos [sic] Trust No. 2."

Rule 47 of the Texas Rules of Civil Procedure describes the components of a counterclaim as 1) a short statement of the cause of action sufficient to give fair notice of the claim involved, 2) in all claims for unliquidated damages, only the statement that the damages sought are within the jurisdictional limits of the court, and 3) a demand for judgment for all the other relief to which the party deems himself entitled. Comparison of R.W.'s averments to the standard set by Rule 47 immediately reveals that none of the elements of Rule 47 were met. There is no general prayer for relief, no allegation that the damages were within the trial court's jurisdictional limits, and no description of any particular cause of action. All R.W. did was deny ANB's allegation that it should be allowed

10

to resign as trustee. And, he based that denial upon the mere suggestion that there were "questions" about ANB's "acts." What the "questions" or "acts" were, what rights or interests of R.W., if any, were involved, or the injury, if any, supposedly suffered by R.W. due to the unspecified acts went unmentioned.

While Texas follows the theory of "notice pleadings," *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex. 2000), the concept still requires the litigant to provide fair notice of the claims involved to the accused. TEX. R. CIV. P. 47(a); *In re Marriage of Richards,* 991 S.W.2d 32, 35 (Tex. App.–Amarillo 1999, pet. dism'd). And, to be fair, the allegations must be sufficient to inform a reasonably competent attorney of the nature and basic issues of the controversy and of the potentially relevant evidence. *In re Marriage of Richards,* 991 S.W.2d at 35. Merely stating that ANB should not be allowed to resign because of unspecified "questions" created by unspecified "acts" hardly falls within that ambit.

More importantly, the record discloses that a discovery dispute arose after R.W. filed the answer containing the language that he now characterizes as a counterclaim. It involved ANB's desire to conduct discovery upon the allegation and determine the nature of the "questions" alluded to by R.W. The trial court subsequently convened a hearing to resolve the matter. During same, and in attempt to bolster his effort to resist the discovery, R.W. represented to the trial court, through his counsel of record, that he ". . . filed nothing seeking affirmative relief from the Bank nor has any respondent . . . to my knowledge," and ". . . there is no affirmative relief sought from the Bank." So too did he inform the trial court (again through his attorney) that he was quite willing to execute a judgment permitting ANB to resign.

11

Given the oblique nature of the allegations relied upon by R.W., their failure to satisfy the requirements of Rule 47, and R.W.'s own representation to the trial court made in effort to defeat discovery, we are unable to say that the original answers of R.W. included counterclaims. As recognized in *Eikon King St. Manager, L.L.C. v. LSF King St. Manager, L.L.C.*, 109 S.W.3d 762 (Tex. App.–Dallas 2003, pet. denied), simply alleging in one sentence that a litigant's conduct violated the covenant of good faith and fair dealing did not give fair notice sufficient to comply with Rule 47. *Id.* at 771. The same is no less true here. Stating that "questions" exist regarding "acts" of a party would not afford a reasonable attorney fair notice of the claims involved or potentially relevant evidence necessary to defend against them.[5] Thus, and as a matter of law, the trial court did not err in rejecting R.W.'s contention that application of §16.069(b) of the Civil Practice and Remedies Code barred entry of summary judgment.

*Continuing Tort*

Generally, a cause of action accrues when a wrongful act causes injury. *Murray v. San Jacinto Agency, Inc.* 800 S.W.2d 826, 828 (Tex. 1990); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.,* 53 S.W.3d 799, 812 (Tex. App.–Austin, pet. denied). Furthermore, limitations begin to run when the cause of action accrues. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.,*

---

[5]R.W. suggests that because ANB sought discovery to uncover the particular "questions" and "acts," it was afforded sufficient notice. We disagree. There is a difference between a pleading that gives an opponent notice of the cause of action and a cautious attorney seeking to conduct discovery because of vague, nondescript allegations. The focus lies on the provision of notice to an opponent, not on motivating an opponent to act. Moreover, the applicable standard involves what a "reasonable," as opposed to a particular, attorney would have gained from the words of the pleading. A reasonable attorney would have garnered little to no information about the nature of R.W.'s supposed claims and injury from the allegations R.W. uttered in his original answers.

12

53 S.W.3d at 812. Yet, this is not true if the act involves a continuing tort. *Id.* The latter arises when the wrongful conduct is repeated over a period of time. *Id.* In such a situation, each act creates a separate cause of action, and the cause does not accrue, for purposes of limitations, until the misconduct ends. *Dickson Constr., Inc. v. Fidelity & Deposit Co.,* 960 S.W.2d 845, 851 (Tex. App.–Texarkana 1997, no pet.). Nonetheless, care must be taken to distinguish between 1) repeated injury proximately caused by repetitive wrongful or tortuous acts and 2) continuing injury arising from one wrongful act. While the former evinces a continuing tort, the latter does not. *Id.* (stating that for a continuing tort to arise there must be both continuing misconduct and additional injury). For instance, a continuing tort does not arise from one's copyrighting a song that another wrote and then repeatedly selling the song and reaping profit from each sale. *Daboub v. Gibbons*, 42 F.3d 285, 290-91 (5th Cir. 1995). While it may be said that the injury continues with each sale and receipt of a royalty, the act that caused the continuing injury was the one act of copyrighting the song. *Id.*

Here, it is alleged that the collection of fees by ANB as the purported trustee of a non-existent trust evinced a continuing tort. While the receipt of those fees, and their concomitant reduction in funds payable to Robert and Mabel, may evince a continuing injury, that injury arose from one act, that act being ANB's assumption of control as trustee over the property granted Robert and Mabel for their life. And, more importantly, that act occurred in 1968 when ANB began exercising that control. In other words, while one may contend that the injury was continuing, it arose from a single act of usurpation. In that light, the circumstances before us liken to those in *Daboub*. The individuals truly entitled to the royalties may have suffered a continuing injury each time the royalties were paid to

13

another, but that injury arose because of one act, *i.e.* someone else copyrighting the song. Similarly, while Robert and Mabel may have been entitled to the monies which ANB purportedly received as its trustee fees, the injury arose from ANB's initial assumption of control over their property in 1968. Consequently, we do not have a continuing tort before us, and the trial court did not err in rejecting the argument below.

Finally, R.W. suggests, in the alternative, that even if the continuing tort theory did not apply, he was entitled to collect damages for the four years preceding the date he filed his actual counterclaim in 1999. Aside from the fact that the argument is both conclusory and bereft of citation to legal authority, it is incorrect. Again, the act giving rise to the injury occurred in 1968. Furthermore, the record illustrates that R.W. obtained knowledge of the supposed impropriety of ANB's conduct by March of 1994. Assuming *arguendo* that the limitations period was four years (as R.W. suggests), then he was obligated to sue ANB within four years of March 1994. Yet, his counterclaim was not filed until 1999. Thus, it was time-barred.

We modify the summary judgment to declare that the will of Charles Veigel granted Robert Veigel and Mabel Walter Rogers a life estate, free of trust, in the properties bequeathed to them. In all other respects, the summary judgment is affirmed.


                              Brian Quinn
                              Justice


14