

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-12-00084-CV

MAMOON N. ALAHMAD                                        APPELLANT

V.

ISMAIL "SAM" ABUKHDAIR                                   APPELLEE

----------

## FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

On January 30, 2014, this court issued an opinion affirming the trial court's judgment. Appellant Mamoon N. Alahmad (hereinafter Mike) filed a motion for rehearing and then an amended motion for rehearing. After due consideration, we deny Mike's amended motion for rehearing but withdraw our prior opinion and judgment dated January 30, 2014, and substitute the following in its place.

---

[1]*See* Tex. R. App. P. 47.4.

Mike's amended motion for rehearing presents a single issue for rehearing; but that issue was not raised as an issue in Mike's brief, nor was it briefed in any way in Mike's brief filed with this court.[2]   Therefore, the issue presented in the amended motion for rehearing has been waived, and we will not address it on rehearing.  *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (holding that even issues that are expressly raised are waived if no cogent argument or citation to authorities exists in the parties' appellate brief concerning the issue); *Coastal Liquids Transp., L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 885 (Tex. 2001) (explaining that issue raised for first time on rehearing is waived); *Wentworth v. Meyer*, 839 S.W.2d 766, 778 (Tex. 1992) (Cornyn, J., concurring) ("[T]he sole purpose of a motion for rehearing is to provide the court an opportunity to correct any errors on issues already presented. . . .  A motion for rehearing does not afford a litigant an opportunity to raise *new* issues"); *Rogers v. Ardella Veigel Inter Vivos Trust No. 2*, 162 S.W.3d 281, 291 (Tex. App.—Amarillo 2005, pet. denied) (op. on reh'g) (explaining that new issues cannot be raised by way of a motion for rehearing); *Story Servs., Inc.*

---

[2]Mike raised six issues:  five issues challenged the trial court's failure to grant his motion for new trial on grounds of legal and factual sufficiency of the evidence to support jury findings other than the finding challenged in the amended motion for rehearing, and one issue challenged the judgment's offset of the jury's awards.  None of these issues raised the issue presented on rehearing, which is that the trial court erred by "holding that when the plaintiff recovers compensatory damages based on a finding of actual fraud, which is an intentional tort, the plaintiff may then recover exemplary damages based on a separate finding, this time by clear and convincing evidence, that the very same fraud was committed 'intentionally.'"

*v. Ramirez*, 863 S.W.2d 491, 505–06 (Tex. App.—El Paso 1993, writ denied) (same). With this addition to our prior opinion, the balance of our prior opinion remains unchanged.

## I. INTRODUCTION

Mike and Appellee Ismail "Sam" Abukhdair created a business together for the purpose of purchasing a convenience store; they subsequently decided to dissolve their business relationship and entered into a "buyout" transaction concerning the convenience store; the buyout transaction involved several documents, including a dissolution agreement, a deed of trust, and a security agreement. Sam sued Mike, alleging fraud by material misrepresentation and by omission concerning the buyout transaction and the associated documents. Mike counterclaimed for breach of the various aspects of the buyout transaction. A jury found for Sam on the fraud claims and awarded actual damages to Sam; the jury also found by clear and convincing evidence that the harm to Sam resulted from intentional fraud and awarded exemplary damages to Sam. The jury found for Mike on his counterclaim against Sam and awarded Mike actual damages in the same amount as the exemplary damages that it awarded to Sam. The trial court signed a judgment on the jury's verdict, crediting the jury's award to Mike against the total amount Mike owed to Sam based on the jury's award to Sam.

Mike perfected this appeal and in six issues argues that the trial court erred by not granting him a new trial because the evidence is legally and factually

3

insufficient to support the jury's findings and because the trial court erred by offsetting the damage awards. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mike and Sam were the only two witnesses at trial. They gave divergent testimony on the facts surrounding the lawsuit, as set forth below.

### A. Relationship Between Mike and Sam

### 1. Mike's Testimony

Mike testified that he and Sam met at a social event in California in 2004 while Mike was a branch manager at U.S. Bank. Sam came to the bank where Mike worked. At the meeting, Sam talked with Mike about Sam's portfolios and real estate transactions. U.S. Bank later fired Mike; Mike testified that they used the excuse that he had allegedly looked at a family member's account, which was a violation of U.S. Bank's policies, but Mike believed that he was fired because there had been a change in upper management.

Mike testified that he did not tell Sam anything about his business background before he went into business with Sam. Mike denied giving Sam a copy of his résumé[3] but admitted telling Sam that he had an MBA.[4] Mike testified that he had disclosed to Sam that he had some financial problems in his past and that he had filed bankruptcy.

---

[3]A copy of Mike's résumé was admitted into evidence during his testimony.

[4]Mike testified that he had received his MBA via correspondence from Columbus University.

4

## 2. Sam's Testimony

Sam also testified that he and Mike met in California in 2004 at a social event. Mike told Sam that he was a "banker, investment expert"; that he had worked for Morgan Stanley, Wells Fargo, and the Meyers Group; and that he was working for U.S. Bank. Mike solicited Sam's banking and investment business, and Sam opened two accounts—a business checking account, in which he deposited $15,000, and an investment account, in which he deposited $100,000—with Mike's bank. Sam said that Mike provided him with investment advice regarding his funds.

After Mike was terminated from U.S. Bank, he hand-delivered his résumé to Sam at Sam's business in Sacramento.[5] At that point, Mike was looking for a job, and Sam wanted to know his qualifications. Sam testified that he felt like Mike was qualified to purchase a convenience store based on his résumé and his knowledge about businesses. Mike did not tell Sam that he had filed for bankruptcy. Sam testified that would have made a difference in his decision to partner with Mike.

## B. Purchase of the Convenience Store

### 1. Mike's Testimony

Mike said that he originally looked for a convenience store in Arizona and that Sam told him that they should look in Texas because Sam has relatives in

---

[5]Sam testified that over the course of his lifetime, he had purchased four or five convenience stores in California.

Texas. Mike responded, "Sure, great, great. Great friend of mine, a guy with 29 years plus experience in the convenience stores and the real estate, I said, [']Why not.[']" Mike testified that they decided on a convenience store in Arlington known as LD's Shortstop and that they both participated in the negotiations.[6] Mike testified that both he and Sam did the due diligence prior to the purchase; they reviewed the store's financial statements, visited the store multiple times, met with the owner, looked at the taxes and sales reports, and "watched inventories and traffic." When asked whether he had investigated the taxes or researched what was done on the liens against the property, Mike testified that was why they had hired attorneys. Mike said he followed Sam's lead on the purchase because Sam had over two decades of experience. Mike denied providing Sam with his opinion of what the store was worth.

In August 2006 during the negotiations to purchase LD's Shortstop, Mike sent an email[7] to Laurie D'Alleva, the owner of LD's Shortstop, stating that they needed to find a way not to flag the 2003 property tax lien;[8] otherwise, it would raise "so many red flags." Mike explained to Laurie that he was worried about raising red flags to the attorneys, specifically Legacy Bank's attorneys and the

---

[6]In Mike's deposition, he stated that Sam decided on the store, that he (Mike) had no active role, and that he was just going along and following the leader (Sam).

[7]The email was admitted into evidence as Plaintiff's Exhibit 3.

[8]Mike testified that the problem with the 2003 taxes was disclosed when they received the commitment letter from the title company.

broker's attorneys. At trial, Mike denied that he was hiding tax liens from Sam and that he had signed a side agreement with Laurie to hide from Sam the problem with the unpaid 2003 property taxes. When Plaintiff's Exhibit 7 was admitted, showing a September 6, 2006 agreement between Mike and Laurie that required Laurie to pay a portion of the unpaid 2003 property taxes and that required Mike to pay the remainder, Mike testified that the signature on the document was not his.

Victor Waid, Sam's attorney in Sacramento, hired Jeff Hacker to represent Mike and Sam in the transaction to purchase LD's Shortstop. Mike testified that they entered into a partnership agreement in September 2006 to form SAMIK, LLC and that he owned 49.5%. To make sure that the store could continue to sell beer and wine, Mike testified that they held on to the seller as a one-percent owner. Mike testified that he and Sam bought LD's Shortstop and the real estate on which it was located. He said that they bought the corporation "as is" in order to "hold on to everything the way that it was, the [Texas Alcoholic Beverage Commission] license, the lottery, and the tobacco license."

When Legacy Bank—which was the holder on the note for LD's Shortstop—found out there was a change in ownership, it called the note, and Mike and Sam had to pay it off; Mike loaned Sam $300,000, and Sam paid the remaining $888,000. When Mike loaned Sam $300,000 for the Legacy Bank note, Mike said that he and Sam had an oral agreement that Mike's payment included his half of the attorney's fees to Legacy Bank.

7

After the purchase, Mike ran the day-to-day operations of the convenience store. Early in November 2006, Mike sent Sam $12,000, which represented his share of the net profit. In December 2006, Mike sent Sam more money because the store was continuing to show a profit. Mike testified that he did not remember the amount of sales taxes that he had paid during the period that he was at the store. Plaintiff's Exhibit 29 was thereafter admitted, which contained sales tax reports for the time period covering October 10, 2006 through April 2, 2007. Mike testified that the reports show total sales of zero and total taxes due of zero, that Laurie had filed the reports in October 2006 and January 2007, that Mike had filed the reports in November and December 2006 and February 2007, and that Sam had filed the report dated April 2, 2007.[9] Sam's last name is misspelled in the April sales tax filing; Mike denied that he had filed that return. Despite showing zero sales and zero sales tax due, Mike testified that the sales tax that he had paid could have been in excess of $5,000 but was less than $10,000.

Although Mike had testified previously in his deposition that he did not remember any problems after they bought the store, he testified at trial regarding numerous problems with the store. Mike found out in early 2007 that there was a problem with TABC. Mike immediately contacted Sam. The problem was not fixed while Mike was there, but Mike testified that the store did not lose its liquor license. Mike testified that from day one, there were problems with issuing

[9]No sales tax return was filed in March; presumably, that is why the April 2, 2007 return shows that a late fee was paid.

8

money orders. Mike denied writing money orders for himself for personal reasons without reimbursing the store. Sam completed paperwork to obtain a new permit to sell money orders, but it never got approved. Mike testified that they lost the tobacco license in early March 2007 because he had purchased cigarettes from a person who was working for Sam's Club. Mike testified that the tobacco license was re-obtained two weeks later while he was still at the store.

### 2. Sam's Testimony

Sam and Mike began discussing the idea of purchasing a convenience store early in 2006 after Mike mentioned that he had worked at a Shell gas station in Roosevelt and was familiar with the business. Mike mentioned to Sam that he was researching the internet for business locations in Arizona and Texas. Mike told Sam that he had a friend and some uncles who had bought convenience stores in Dallas and were making good money, so he was going to explore that area for a location.

Mike invited Sam to come to Texas to look at some stores and give him advice on different locations. Sam came to Texas twice with Mike and looked at five or six stores.

Before the purchase, Mike brought Sam some numbers from LD's Shortstop, including some tax returns and numbers from the various businesses within the business, including gas sales, grocery sales, Laundromat sales, eight-liner income, check-cashing income, and rental income from a store next to LD's Shortstop. Mike told Sam that they could net $40,000 per month from all of the

9

different businesses within the business. Mike also told Sam that he estimated that if they bought at $3 million, they would make a profit of $1 million once the deal closed because the real estate was worth $3.9 to $4 million. Based on the numbers that Mike had presented to Sam, Sam believed that this was plausible. Sam did not independently research the numbers that Mike had brought to him; Sam trusted Mike's judgment. Sam did not personally inquire into things like property taxes; Mike was handling all of the due diligence, including investigating liens on the property, liens on the business, taxes owed, and utilities owed. Mike told Sam that he was looking into those things. Mike did not tell Sam that there were unpaid taxes on the property totaling $80,000. Sam testified that would have been a red flag for him; he would have insisted on having the taxes paid before the purchase. Sam did not have any conversations with Laurie before he agreed to purchase the business.

Sam and Mike formed a limited liability company called SAMIK, LLC[10] to purchase LD's Shortstop from Laurie for $3,135,000, and SAMIK, LLC assumed the debt of approximately $2.4 million that was owed to Legacy Bank and Business Loan Express. Sam gave Laurie a cashier's check for $450,000, and Mike provided a $239,000 cashier's check. There was another note for the leased equipment in the Laundromat for approximately $80,000, which Sam and

_____

[10]Sam testified that he believed that Mike had created SAMIK, LLC to act as an agent to LD's Shortstop; he was surprised to learn that the only listing for SAMIK is a name change from a previous corporation and that it was created in 2000.

Mike agreed to pay. Sam did not know of any other debts. Sam's understanding for why they bought the business, LD's Shortstop, rather than the assets of the business was that they were not qualified to assume the two loans; Mike assured Sam that if they kept paying the two loan payments, the banks would not call the notes.

After the purchase, Mike moved from California to Texas to run the day-to-day business. Sam received a call on March 7, 2007 from the store manager saying that Mike had been arrested and that all tobacco products had been seized from the store. Sam came to Texas and asked Mike what had happened; Mike told him that he had been buying cigarettes from Sam's Club. Sam also first learned during this trip that they could not sell money orders. Mike told Sam that a customer had purchased five $50 money orders, that the money order company had found that suspicious, and that they had pulled out the money order machine because of misuse. Sam testified that they were able to sell lottery tickets for a while, but then that license was eventually revoked because the license was under the old ownership and Mike did not get a new permit to sell lottery tickets.

### C. Dissolution of Business Relationship

### 1. Mike's Testimony

After the loss of the tobacco license, Mike and Sam reached an agreement to end their business relationship. Mike testified that Sam offered him $709,000 to buy out his portion of the partnership; Mike agreed to this offer and executed

11

an agreement of dissolution on March 30, 2007.[11]  The terms of the dissolution agreement required Mike to loan Sam $300,000 to assist Sam in the payoff of the loan existing with Legacy Bank.  Mike testified that he had loaned Sam $300,000 and that he had a copy of the official check, but the check was not admitted into evidence.

Mike testified that he had fulfilled all of his obligations under the dissolution agreement.  Mike initially denied that at the time of the dissolution, the convenience store inventory was short by $32,401; the dissolution agreement provided that at the time of the buyout, "the inventory value shall be no less than $144,260.00 at cost" and that should the inventory be less than that, the difference would be subtracted from the amount Sam owed Mike for the buyout.  Mike later conceded that Sam was entitled to a $32,000 credit for the difference in the inventory[12] and a $12,000 credit for a payment that Sam had made to Legacy Bank.[13]  Under the dissolution agreement, Mike was also required to

---

[11]Mike believed that by signing the dissolution agreement he had sold, assigned, transferred, released, and granted to Sam any and all interest that Mike had owned in SAMIK, LLC.  Mike admitted that when he sold his interest, he was no longer a partner in SAMIK, LLC, despite the statement to the contrary that was included and sworn to in his original answer and counterclaim.

[12]Mike testified that they had recovered $16,000 on the cigarettes that were seized but that the cigarettes had not been recovered as of the dissolution on March 30, 2007.  Mike admitted that the dissolution agreement did not provide any benefit for him if the confiscated cigarettes were later recovered.

[13]Plaintiff's Exhibit 26, a letter from Jeff Hacker to Sam setting forth certain credits and indebtedness, was admitted into evidence during Sam's testimony.  The letter lists over $72,000 worth of credits.  Mike testified that the letter

have the Ballard system installed on the gas pumps to bring them up to code. Mike testified that he had made arrangements to have the Ballard system installed, but at the time he left, the system had not been installed; Mike was not aware that Sam had paid $7,000 to have the Ballard system installed. Mike testified that he had paid all of the utility bills and all of the water bills. Mike testified that the fuel bills were paid automatically through the business account that was supposed to be under his name.

Mike testified that under the dissolution agreement he had agreed to pay all of the taxes for the period when he was running the store and that at the time of the dissolution, all of the taxes that had been incurred had been paid. Mike testified that the store was still paying $4,000 per month on the unpaid 2003 property taxes at the time of the dissolution. When he and Sam took over the business, Mike believed that the sales tax had been paid. He testified that he did not learn that until a couple of weeks before the trial that the unpaid sales taxes from October 1, 2005 through June 30, 2007 totaled $765,000. Mike could not recall how much sales tax he had paid since he had left on March 29, 2007. Mike testified that he was not aware of any personal property taxes and that no real estate taxes were due while he worked at the store.

---

mistakenly adds the $72,000 worth of credits to the amount due from Sam. It would also appear that the letter mistakenly identified both the $12,000 payment made to Legacy Bank and the $23,000 gas payment as having been paid by Mike.

Mike testified that he had not been paid any of the $709,000 owed to him by Sam. Mike's attorney Jeff Hacker sent Sam a demand letter dated August 7, 2007, requesting that Sam pay Mike.

At the conclusion of Mike's testimony, Sam offered Defendant's Exhibits 3 (bill of sale), 5 (the deed of trust), and 8 ($300,000 promissory note signed by Sam). On cross-examination, Mike could provide no explanation for why the first time a signed version of the $300,000 promissory note (Defendant's Exhibit 8) appeared was the Monday of the week of trial; he said that the copy had been with his attorney "for a while." Mike conceded that Defendant's Exhibit 5, the deed of trust, does not mention a $300,000 promissory note and that the signature page of Defendant's Exhibit 8 containing Sam's signature is darker than the other pages of the note. Mike denied creating a signed signature page as a way to strengthen his case at the last minute. Mike testified that he had watched Sam sign the documents in Hacker's office and that he had left the documents at Hacker's office because some of the documents needed to be recorded.

## 2. Sam's Testimony

Sam testified that after the tobacco incident, he and Mike came to an agreement for Sam to buy out Mike. Mike's attorney, Jeff Hacker, prepared the dissolution agreement. On March 30, 2007, Mike and Sam signed the dissolution agreement, and Sam executed a deed of trust, a security agreement, and a promissory note for $709,000 and became the sole owner of the property. The

note was due June 30, 2007. Sam testified that he had not paid Mike the $709,000 owed under the promissory note because Mike owed him money.

Sam testified that SAMIK, LLC was dissolved on March 30, 2007, and that IMA10, LLC started in its place; IMA10, LLC owned the same things that SAMIK, LLC had owned before it was dissolved; SAMIK, LLC had owned the store but not the property, which was owned by Mike and Sam. Sam testified that although Laurie had owned a one-percent share of SAMIK, LLC, she did not sign off on the dissolution agreement because Jeff Hacker did not include her name among the signature blocks. Sam's understanding was that SAMIK, LLC had ceased to exist and that Laurie therefore did not own any interest in the new corporation. Sam testified that he never agreed to pay the back property taxes if Laurie would agree to the dissolution.

Beginning April 1, 2007, when Sam took over, there were no records for the store. Sam testified that he had not seen any indication that sales taxes were paid during the time that Mike ran the business. Mike did not tell Sam that there was a problem with the sales tax; Sam first learned that sales taxes had not been paid when he received letters from the State Comptroller in May 2010. Due to the nonpayment of the sales taxes for the time prior to April 1, 2007 when Sam took over the store,[14] the State Comptroller came to the store, seized the cash that was in the register, and emptied Sam's bank account of $48,000. Sam

_____

[14]Sam testified that after he took over the convenience store, he reported all the sales and paid all of the taxes due on those sales.

15

testified that the State Comptroller assessed the prior sales taxes against IMA10, LLC. Sam said that he holds Mike responsible for the sales taxes incurred during the period before April 1, 2007.

The inventory on the date that Sam took over was supposed to be $144,000, but it was only $111,000. The $111,000 inventory included $23,000 worth of fuel that Mike had not paid for and for which he did not reimburse Sam. When Sam took over the store on April 1, 2007, there were unpaid utility bills in the amount of $11,000. Mike was supposed to have paid for the Ballard system to be installed so that the hoses on the gas pumps would meet code enforcement; Mike had paid a deposit but did not pay the $7,200 balance, which Sam had to pay.

After April 2007 and before June 30, 2007, when Sam's note to Mike became due, Sam learned that property taxes for 2003, which totaled $22,000, had not been paid. Under the dissolution agreement, Mike was required to pay the property taxes for January through March 2007; Sam testified that Mike also did not pay the prorated property taxes of $10,000. Sam also learned that personal property taxes from 2003 through 2006 had not been paid, which totaled $61,000. Mike also had not paid the personal property taxes from January through March 2007, which totaled $2,000. When Sam saw Laurie in August 2009, he asked why she had not paid the property tax and the personal property tax, and she said that Mike had agreed to pay for those personally. Laurie showed Sam a document that Mike had signed, agreeing to pay for the

taxes; thus, Sam believed that Mike was responsible for the taxes. Sam testified that Tarrant County filed a lawsuit against Sam and Mike for the property taxes and that the lawsuit had been resolved because he (Sam) negotiated to pay $5,000 down and to pay $1,000 per month toward the back taxes.

Sam also learned that they were "having some serious problem[s] acquiring a TABC license" and that Mike had not applied for a license as of the date that Sam took over the store's operations. Sam was informed that he could not get a liquor license because he was not a Texas resident. He was told to create a corporation and have a Texas resident as a manager; he did that and named Omar Subhi as manager. Sam testified that he had to hire an attorney to create a new corporation to satisfy TABC in order to obtain a liquor license.[15] Sam testified that he is now the sole owner of the new corporation, SuperTrak Arlington, Inc., and its only asset is the store; Sam owns the property. Sam said that he had secured a liquor license as of the time of the trial.

Sam also obtained a new license to sell tobacco and replaced the tobacco that had been confiscated.

Sam testified that under the dissolution agreement, Mike was supposed to loan Sam $300,000 to pay off the Legacy Bank note, which had been called once Legacy Bank found out that there was a change of ownership; Mike came up with $280,000. Sam paid Legacy Bank $888,000 by taking out loans against his

---

[15]Sam testified that he is not requesting attorney's fees for obtaining the liquor license.

house in California and other properties in order to come up with the money. Sam paid $8,200 for the attorney's fees; Mike did not pay Sam for his half of the attorney's fees.

Sam said that if he had known about all of the issues that he had learned about after the dissolution, he would not have agreed to the buyout.

## D. Jury's Findings and Trial Court's Judgment

After hearing the above evidence, with respect to the buyout transaction of March 30, 2007, the jury found that Mike had committed fraud against Sam by material misrepresentation, that Mike had committed fraud against Sam by material omission, that a relationship of confidence and trust had existed between Mike and Sam before the buyout, and that Mike had not complied with his fiduciary duty to Sam. The jury awarded Sam actual damages of $949,000. The jury also found by clear and convincing evidence that the harm to Sam had resulted from intentional fraud and awarded Sam exemplary damages of $709,000. The jury further found on Mike's counterclaim for breach of contract that Sam had failed to comply with the terms of the buyout transaction and awarded Mike actual damages of $709,000. The trial court awarded attorney's fees to Mike and entered a judgment on the jury's damage awards to the parties.

### III. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDINGS

### A. Standards of Review

### 1. Legal Sufficiency

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or

suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

## 2. Factual Sufficiency

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Legally and Factually Sufficient Evidence Supports Jury's Finding that Mike Committed Fraud by Material Misrepresentation

In his first issue, Mike argues that the trial court erred by failing to grant his motion for new trial because there was no evidence or insufficient evidence to support the jury's finding that he committed fraud by material misrepresentation.

To recover under a fraud claim, the following elements must be proven: (1) a material representation was made; (2) the representation was false; (3)

20

when the misrepresentation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the misrepresentation with the intent that the other party should act upon it; (5) the party acted in reliance on the misrepresentation; and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (orig. proceeding); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). When no objection is made to a jury instruction, evidence to support a finding based on the instruction should be assessed in light of the instruction given. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001).

The court's charge, which was not objected to by Mike, instructed the jury on the elements of fraud in Question No. 1, asking whether Mike had committed fraud against Sam by material misrepresentation. The word "misrepresentation" was defined as "a false statement of fact." The jury answered "yes."

The agreement of dissolution contains the following affirmative statement:

> Mike warrants and represents, as a material part of this Agreement, that all unpaid and owing debts, expenses, claims, taxes, and other fees incurred on behalf of the business between September 1, 2006 and April 1, 2007 (with the exception of the first lien held by Legacy Texas Bank and any potential liability resulting from the pending lawsuit against the business, Laurie D'Alleuva [sic], et al[.]), shall be or has been paid in full by Mike Alahmad prior to April 1, 2007; . . . .

Mike testified at trial that at the time of the dissolution, all of the taxes that had been incurred had been paid. But Sam's exhibits, including Plaintiff's Exhibit

21

31—a sales tax statement from Susan Combs, the Texas Comptroller of Public Accounts—show that the sales tax "liability is for reporting periods October 1, 2005 through June 30, 2007" in the amount of $751,835.23. Due to the nonpayment of these sales taxes for the time prior to April 1, 2007, when Sam took over the store, the State Comptroller came to the store, seized the cash that was in the register, and emptied Sam's bank account of $48,000.

The jury also heard testimony that Mike knew about the delinquent 2003 property taxes while he was negotiating the purchase of the convenience store. The jury even saw a document titled, "Letter Agreement between Mamoon Alahmad and Laurie D'Alleva," which states that it is a supplemental agreement to the contract of sale for LD's Shortstop. The letter agreement was signed by only Laurie and Mike; Laurie agreed to pay for a portion of the delinquent 2003 property taxes, and Mike agreed to pay the remainder. Despite this letter agreement, Mike testified that he did not sign a side agreement with Laurie D'Alleva to hide the problem with the 2003 taxes from Sam and that the signature on the document was not his. Instead, Mike testified at trial that at the time of the dissolution, he was still making payments through the store of $4,000 per month on the delinquent 2003 property taxes. Sam testified that he did not learn about the delinquent 2003 property taxes until he took over the business after the dissolution, at which time $21,000 in back property taxes remained unpaid.

Finally, although Mike testified that he had fulfilled all of his obligations under the dissolution agreement, he conceded that the inventory did not meet the

22

dollar value required in the dissolution agreement and conceded that Sam was entitled to a credit for the difference. And although Mike testified that he had paid all of the utility bills, that the fuel bills were automatically paid through an account under his name, and that he had paid for the Ballard system to be installed for the fuel pumps, Sam testified that the inventory included $23,000 worth of fuel that Mike had not paid for; that there was $11,000 worth of utility bills that were unpaid when Sam took over the store; and that although Mike had paid a deposit for the Ballard system, a $7,000 balance remained, which Sam had to pay.

Having considered evidence favorable to the finding of fraud by material misrepresentation if a reasonable factfinder could and having disregarded evidence contrary to the finding of fraud by material misrepresentation unless a reasonable factfinder could not, we hold that more than a scintilla of evidence supports the jury's finding that Mike committed fraud against Sam by material misrepresentation because Mike made numerous material misrepresentations that were false, he knew they were false, he made the misrepresentations with the intent that Sam should act upon them, and Sam acted in reliance on the misrepresentations and suffered injury. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 48–49 (holding that testimony at trial provided more than a scintilla of evidence supporting appellee's contention that appellant intentionally made representations that it never intended to keep in order to induce appellee to enter into the contract at a low bid price and that appellee relied on the misrepresentations to its detriment); *Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*,

23

No. 04-12-00837-CV, 2013 WL 5812989, at *6 (Tex. App.—San Antonio Oct. 30, 2013, no pet. h.) (holding evidence legally sufficient to support jury's finding that appellant fraudulently induced appellee into entering into lease by making knowing misrepresentations).  After considering and weighing all of the evidence in the record pertinent to the finding of fraud by material misrepresentation, we hold that the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the jury's answer should be set aside and a new trial ordered.  *See W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 780–81 (Tex. App.—Fort Worth 2008, pet. denied) (holding evidence legally and factually sufficient to support finding that appellant committed fraud against appellee).  We hold that legally and factually sufficient evidence supports the jury's finding that Mike committed fraud by material misrepresentation, and thus the trial court did not abuse its discretion by denying Mike's motion for new trial on this ground.  We overrule Mike's first issue.[16]

---

[16]Mike's second issue challenges the jury's finding that Mike also committed fraud by material omission, and his third issue challenges the jury's finding that a fiduciary relationship existed between Mike and Sam.  The jury's $949,000 damage award was conditioned upon an affirmative finding on the fraud-by-material-misrepresentation question or the fraud-by-material-omission question or the breach-of-a-fiduciary-relationship question.  Because we have found the evidence legally and factually sufficient to support the jury's answer to the fraud by the material misrepresentation question, we need not address Mike's second or third issues.  *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to final disposition of appeal); *see also Barnett v. Coppell N. Tex. Court, Ltd., NTC*, 123 S.W.3d 804, 820–21 (Tex. App.—Dallas 2003, pet. denied).

## C. Legally and Factually Sufficient Evidence Supports Jury's Finding Awarding Actual Damages of $949,000 to Sam

In his fourth issue, Mike argues that the trial court erred by failing to grant his motion for new trial because there was no evidence or insufficient evidence to support the jury's finding awarding Sam actual damages of $949,000.

The jury has the discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation. *See id.* at 787. Here, the jury's award of $949,000 corresponds closely with Sam's testimony about the amounts that Mike had failed to pay under the terms of the dissolution agreement. The following chart summarizing Sam's testimony was admitted into evidence:

| | |
|---|---|
| Inventory deficiency ($144,000 per contract, but actually $111,000) | $33,000 |
| Ballard system | 7,000 |
| 2003 real estate taxes | 21,000 |
| 2003 – 2006 personal property taxes | 61,000 |
| Jan. – March 2007 real estate taxes | 10,000 |
| Jan. – March 2007 personal property taxes | 2,000 |
| Attorney fees re: Legacy Bank (Mike's half) | ~~8,000~~[17] 4,000 |
| Utility bills | 11,000 |
| Fuel bill | 23,000 |
| Sales taxes & penalties per State Comptroller | 765,000 |
| **T O T A L** | ~~**$941,000**~~ **$937,000** |

Although the chart summarizing Sam's testimony includes only $937,000 of payments made by Sam on Mike's behalf, Mike conceded during his case in chief that Sam was entitled to a credit for a $12,000 payment that Sam had made

---

[17]This number and the total at the bottom of the chart were stricken through, and the numbers reflected in the column were written in by hand.

25

to Legacy Bank, which is in addition to the amounts set forth in Sam's chart. Accordingly, we hold that the jury's actual damage award of $949,000 to Sam is supported by legally and factually sufficient evidence and that the trial court did not abuse its discretion by denying Mike's motion for new trial on this ground. *See id.* at 788 (holding evidence sufficient to support jury's damage award). We overrule Mike's fourth issue.

### D. Legally and Factually Sufficient Evidence Supports Jury's Finding Awarding Exemplary Damages of $709,000 to Sam

In his fifth issue, Mike argues that the trial court erred by failing to grant his motion for new trial because there was no evidence or insufficient evidence to support the amount of exemplary damages that the jury awarded to Sam— $709,000—or to support a finding of malice.

Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West Supp. 2013). "Clear and convincing" evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2) (West 2008). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re*

26

*G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

This higher burden of proof alters the appellate standard of legal sufficiency review. In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010)*; Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We review all the evidence in the light most favorable to the finding. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 138 (Tex. 2012); *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. We disregard evidence contrary to the finding unless a reasonable factfinder could not. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

This higher burden of proof also alters the appellate standard of factual sufficiency review. In evaluating the evidence for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so

significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.*

Here, question 8 in the court's charge was conditioned upon an affirmative finding to one of the two fraud questions—fraud by material misrepresentation and fraud by material omission—and upon a finding of actual damages, and it asked whether the jury found by clear and convincing evidence that the harm to Sam resulted from intentional fraud. Question number 9 then asked what amount of money, if any, should be awarded as exemplary damages and set forth the relevant *Alamo Nat'l Bank v. Kraus*[18] factors for the jury's consideration.[19]

In order to determine whether the amount of exemplary damages awarded was reasonable, we consider the factors set forth in *Alamo National Bank v. Kraus,* which include the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety. *See, e.g.*, *Zorrilla v. AYPCO Constr. II, LLC*, 421 S.W.3d 54, 72 (Tex. App.—Corpus Christi Oct. 3, 2013, pet. filed) (quoting *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 767 (Tex. App.—Dallas 2008, no pet.)).

---

[18]616 S.W.2d 908, 910 (Tex. 1981).

[19]Mike did not object to the court's charge.

As set forth above, the jury heard considerable evidence that Mike had fraudulently misrepresented to Sam that all expenses and taxes that were due while he was operating the business had been paid. Sam testified that he learned only after he had agreed to buy Mike out of the business for $709,000, that Mike had failed to pay 2003 property taxes, had failed to pay property taxes since 2003, had failed to pay sales taxes, had failed to pay personal taxes, had failed to install the Ballard System on the gas pumps, had failed to re-obtain a liquor license, had failed to pay utility bills, had failed to pay for gas that was delivered; he also learned that the inventory was not what Mike had represented it to be. Sam also testified to the financial harm he suffered from Mike's conduct, including having to mortgage his home to pay off the Legacy Bank loan. From Sam's testimony and the documentary evidence supporting it, the jury could have reasonably determined that Mike's conduct indicated a pattern of deceptive dealings with Sam and that his conduct was offensive to public notions of fairness and propriety and showed a degree of culpability on Mike's part that rendered an award of $709,000 in exemplary damages reasonable. The exemplary damages award is less than the actual damage award to Sam of $949,000, which is unchallenged on appeal.

Giving due deference to the jury's role in determining the weight and credibility to be given a witness's testimony and applying the above standards of review, we hold that the amount of exemplary damages awarded by the jury is

29

reasonable; the award is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.*

Concerning Mike's challenge to the sufficiency of the evidence to support a malice finding by the jury, because Sam's recovery of exemplary damages was predicated on a finding by the jury of intentional fraud, Sam was not required to prove malice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(1) (specifically enumerating fraud as one of three separate grounds that can be proven to obtain an award of exemplary damages); *cf. Huynh v. Phung*, No. 01-04-00267-CV, 2007 WL 495023, at *11 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (stating that the jury's finding of fraud included an implicit finding of malice). Because we hold that the evidence is legally and factually sufficient to support the amount of the exemplary damage award to Sam, the trial court did not abuse its discretion by denying Mike's motion for new trial on this ground. We overrule Mike's fifth issue.

## IV. MIKE'S COUNTERCLAIM AND THE ONE-FINAL-JUDGMENT RULE REQUIRE SUBTRACTION OF THE DAMAGE AWARDS

The final judgment includes the following provision under the heading "Offsetting Awards and Limitations on Execution":

> Having herein awarded actual and exemplary damages to Plaintiff/Counter-Defendant Abukhdair, totaling Nine Hundred Forty-Nine Thousand Dollars and No Cents ($949,000.00), and Seven Hundred and Nine Thousand Dollars and No Cents ($709,000.00), respectively, as well as actual damages and attorney's fees to Defendant/Counter-Plaintiff Alahmad, totaling Seven Hundred and Nine Thousand Dollars and No Cents ($709,000.00), and Forty-Three Thousand, One Hundred Eighty-Seven Dollars and Fifty

30

Cents ($43,187.50[]), respectively, the Court hereby finds that the total amount awarded herein to Defendant/Counter-Plaintiff Alahmad partially offsets the total amount awarded herein to Plaintiff/Counter-Defendant Abukhdair, leaving only the Remainder of **Nine Hundred and Five Thousand, Eight Hundred and Twelve Dollars and Fifty Cents ($905,812.50),** subject to enforcement, execution[,] and collection; it is, therefore,

**ORDERED, ADJUDGED[,] and DECREED** that only the Remainder of the total amount of actual and exemplary damages awarded herein to Plaintiff/Counter-Defendant Abukhdair is subject to enforcement, execution[,] and collection; . . . .

In his sixth issue, Mike argues that the trial court erred by allowing offsetting awards and limitations of execution. Specifically, Mike argues that Sam did not plead for a setoff as an affirmative defense and therefore was not entitled to a setoff.

A counterclaim is defined as a "claim, which, if established will defeat or in some way qualify a judgment to which the plaintiff is otherwise entitled . . . [and] embraces both setoff and recoupment" or a "claim presented by a defendant in opposition to or deduction from the plaintiff's claim." *See CDB Software, Inc. v. Kroll*, 992 S.W.2d 31, 35–36 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Where both the plaintiff and defendant are entitled to recover differing amounts from each other, the court is required to determine which party is entitled to the greater recovery and render judgment for that party in the amount of the excess. *See Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 894 (Tex. App.—San Antonio 1996, writ denied); *see also* Tex. R. Civ. P. 301 (permitting only one final judgment in any cause).

31

Here, Mike pleaded a counterclaim, which if proven, by its very definition "embraces both setoff and recoupment" and will be deducted from any award given to the plaintiff Sam. Because the jury awarded damages to Sam (on the claims raised in his petition) and to Mike (on his counterclaim), the trial court was required under both the definition of counterclaim and the one-final-judgment rule to deduct the lesser damages, which were given to Mike on his counterclaim, from the greater damages awarded to Sam on his fraud claim. *See* Tex. R. Civ. P. 301; *Chilton Ins. Co.*, 930 S.W.2d at 894–95. We therefore hold that the trial court did not err by rendering judgment for Sam in the amount of the excess, and we overrule Mike's sixth issue.[20]

## V. CONCLUSION

Having overruled the issues necessary for final disposition of the appeal, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED: June 5, 2014

---

[20]We note that case law over the years has not consistently applied the legal definitions of the words "setoff," "offset," and "recoupment" but instead has used the words interchangeably. We need not, however, delve into this inconsistency to resolve Mike's sixth issue because it can be resolved, as set forth above, by applying the definition of "counterclaim" and the one-final-judgment rule.